CUDAHY, Circuit Judge.
 

 This case arose out of the sale by the debtor, Chicago, Milwaukee, St. Paul & Pacific Railroad Company (the “Milwaukee”) of its operating properties (the “Core Assets”) to the Soo Line Railroad Company (the “Soo”). The sale was made pursuant to an asset purchase agreement and Order No. 809 of the district court sitting in bankruptcy and reorganization. The Core Assets included 21 miles of track between Crivitz and Marinette, Wisconsin (the “Connecting Line”).
 
 [1]
 

 The Connecting Line runs east-west and connects a north-south line of the Chicago & Northwestern Railroad (the “Northwestern”) along Green Bay with the north-south line of the Escanaba and Lake Superior Railroad (the “Escanaba”) farther West. In 1982 (while the Milwaukee was in bankruptcy and reorganization), the Escanaba bought from the Trustee of the Milwaukee a line of track from Green Bay, Wisconsin, to Iron Mountain, Michigan. Crivitz is on the Green Bay-Iron Mountain line about midway between these cities. The sale of the Green Bay-Iron Mountain line left the Crivitz-Marinette line in the hands of the Milwaukee, but that line was isolated between the Escanaba at one end and the Northwestern at the other. Hence, the Milwaukee obtained trackage rights — the rights to run its trains — over the Green Bay-to-Crivitz tracks of the Escanaba. With these rights the Milwaukee could run its trains from Green Bay to Crivitz and thence to Marinette (and to Menominee by reason of another trackage rights agreement with the Northwestern).
 

 When the Escanaba and the Trustee entered into their agreement granting track-age rights to the Milwaukee, the Escanaba wanted to obtain some rights in the line from Crivitz to Marinette. Hence, section 19.2 of the agreement between the Trustee and the Escanaba provided that the Esca-naba “shall have a right of first refusal to purchase the Connecting Line.” App. Exhibit A at 13. This agreement required that the Trustee notify the Escanaba of any bona fide written offer for the Connecting Line received by the Trustee from a third party. The agreement gave the Escanaba 60 days to enter into an agreement “under the same terms and conditions” as the offer received from the third party. If upon notice, the Escanaba declined to match the offer, the Milwaukee could sell according to the terms of the offer. However, if the Escanaba exercised its right of first refusal, it could purchase the Connecting Line under the same terms and conditions as the outstanding offer. Section 24 of the trackage/right of first refusal agreement between the Escanaba and the Trustee of the Milwaukee provided
 
 *1190
 
 that disputes between the parties were to be arbitrated.
 
 Id.
 
 at 16-16.
 

 In 1983 and 1984, the Northwestern and the Soo made offers to purchase the Core Assets of the Milwaukee, including the Connecting Line. As a result of these offers the Escanaba sought to exercise its right of first refusal to purchase the Connecting Line. But the Trustee declined to consider the Escanaba’s offer on the ground that the other offers (of the Northwestern and the Soo) encompassed all the Core Assets, not merely the Connecting Line, and the right of first refusal did not apply in the event of such offers. The Escanaba then instituted arbitration under the trackage rights agreement. On January 29, 1985, an arbitration panel convened pursuant to the trackage rights agreement found that the Escanaba had the right of first refusal to acquire the Connecting Line whether or not the Connecting Line was offered for sale separately or as part of the sale of the Core Assets. The panel directed the Milwaukee not to sell the Connecting Line without first giving the Escanaba an opportunity to exercise its right of first refusal. In the event the parties were unable to negotiate sale terms, the panel proposed to reconvene to set a sales price.
 

 On February 19,1985, the reorganization court entered Order No. 809, authorizing the Trustee to sell the Milwaukee’s Core Assets, including the Connecting Line, to the Soo or to its wholly owned subsidiary, SLRCO. Paragraph 10 of Order 809 imposed “Appendix B”
 
 [2]
 
 protections for the employees of the Soo and of the Milwaukee affected by the sale of the Milwaukee’s Core Assets, including the employees affected by the sale of the Connecting Line.
 
 [3]
 
 In paragraph 11 of Order No. 809, the reorganization court retained jurisdiction to address disputes arising under or with respect to the asset purchase agreement.
 
 [4]
 

 After the issuance of Order No. 809 authorizing the sale of the Core Assets to the Soo, the Escanaba moved to substitute the Soo (and its affiliate, SLRCO) for the Trustee in the arbitration proceedings dealing with the Connecting Line because the Escanaba wanted the Connecting Line itself rather than damages. On April 8, 1985, the reorganization court entered Order No. 816, by which it substituted the Soo (and SLRCO) for the Milwaukee as the parties in interest in the arbitration proceeding. The Soo appealed Order No. 816 to this court. We held that “Orders No. 809 and 816, and the asset purchase agreement, transferred to the Soo the Milwaukee’s obligations under the trackage rights agreement.”
 
 In the Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,
 
 784 F.2d 831, 835 (7th Cir.1986).
 

 On December 6, 1985, the arbitration panel issued a second decision establishing the purchase price of the Connecting Line and devising a method for apportioning employee protection responsibilities should the Interstate Commerce Commission (the “ICC” or the “Commission”) impose such conditions in connection with approval of the sale to the Escanaba. Award of December 6, 1985 at 56-58; App. Exhibit E. The United States District Court for the District of Minnesota enforced the arbitration awards of January 29, 1985 and De
 
 *1191
 
 cember 6,1985.
 
 Escanaba & Lake Superior R.R. v. Soo Line R.R.,
 
 No. 3-85-1903 (D.Minn. Jan. 30, 1986); App. Exhibit G. On December 10, 1985, the Escanaba and the Northwest Wisconsin Railroad Transportation Commission (the “NWRTC”), a non-carrier created pursuant to a Wisconsin statute, jointly filed with the ICC a petition requesting an exemption under 49 U.S.C. section 10505 from the prior approval requirements of 49 U.S.C. section 10901. This would allow the NWRTC to acquire the Connecting Line and permit the Esca-naba to operate over that line. On the same date the Escanaba exercised its right of first refusal by tender of payment to the Soo of the price established by the arbitration panel, and the Soo was advised that title to the Connecting Line was to be transferred to the NWRTC, to which the Escanaba had assigned its rights. As as-signee of Escanaba’s right to acquire the Connecting Line, the NWRTC entered into a trackage rights agreement with the Esca-naba in which the Escanaba was designated as the operator of the Connecting Line while the NWRTC was the legal title-holder. There was newspaper speculation at the time that the NWRTC involvement might help to minimize labor protection costs.
 
 See Railroad Seeks to Buy Soo Tracks in County,
 
 Marinette Eagle Star, Dec. 7, 1985; Brief of RLEA at 9.
 

 On January 7, 1986, the ICC in
 
 Northeast Wisconsin Railroad Transportation Commission,
 
 Finance Docket No. 30760 (January 7, 1986) (the “ICC Decision”), granted permission for the NWRTC to acquire the line from the Soo and gave the Escanaba authority to operate over the Connecting Line as a trackage rights carrier. Incident to its approval of the transaction pursuant to 49 U.S.C. sections 10901 and 10505, the Commission determined that the imposition of labor protection was discretionary under 49 U.S.C. section 10901. The Commission declined to impose labor protection because “no need ha[d] been shown.” However, in approving the NWRTC’s acquisition and the Escanaba’s operation, the ICC stated:
 

 In granting an exemption from 49 U.S.C. 10901, we are only removing a regulatory impediment to entry by NWRTC and [the Escanaba]. Our decision does not require NWRTC to acquire and [the Escanaba] to operate the Connecting Line, it is merely permissive. If there is a dispute in the courts over the right to acquire and operate a line, our action here will not affect either parties’ rights and remedies.
 

 ICC Decision at 2; App. Exhibit F.
 

 On January 28, 1986, the Railway Labor Executives Association (“RLEA”) filed in the reorganization court a Motion to Reopen Order No. 809 and a Complaint for Declaratory and Injunctive Relief. The complaint sought to clarify whether the Appendix B employee protective conditions imposed in paragraph 10 of Order No. 809 applied to the Soo and to the Escanaba “so that [Milwaukee] employees impacted by the transfer of the [Connecting] Line to the Soo or to the [Escanaba]” would be protected as required by section 5(b) of the Milwaukee Railroad Restructuring Act (“MRRA”), 45 U.S.C. section 904(b)(1).
 
 [5]
 

 In response to the Escanaba’s Motion to Dismiss the Complaint and Opposition to the Motion to Reopen, the RLEA contended that both the Soo and the Escanaba were obligated to provide protective benefits to employees who were affected by the Connecting Line transfer. The RLEA claimed that the Soo alone could not provide statutorily sufficient employee protection.
 

 The reorganization court ruled in its Order No. 982 that the Escanaba was “subject to the terms and provisions of Order No. 809 and Appendix B thereto with respect to its operation of the Connecting
 
 *1192
 
 Line_”
 
 In the Matter of Chicago, Milwaukee, St. Paul & Pacific R.R.,
 
 No. 77 B 8999, mem. op. at 7-8,1988 WL99201 (Sept. 8, 1988). The court rejected the argument that the Escanaba’s acquisition of the Connecting Line was a post-bankruptcy transaction and therefore held that it had jurisdiction to impose labor protection pursuant to section 5(b) of the MRRA. The reorganization court said that, because the negotiation of the asset purchase agreement triggered the Escanaba’s right of first refusal, the Escanaba “matched” the Soo’s offer “in effect” through the arbitration award.
 
 Id.
 
 at 6. The court found that the Escana-ba had “stepped into the Soo’s shoes” by exercising its right of first refusal and not only received the Connecting Line but also “assumed the obligations” of the Soo under the asset purchase agreement.
 
 Id.
 
 at 6. The reorganization court concluded that the Escanaba became the “purchaser” under the asset purchase agreement and that the “transaction was a bankruptcy transaction subject to Section 5(b) of the Milwaukee Railroad Restructuring Act and Paragraph 10 of Order No. 809.”
 
 Id.
 
 at 6-7.
 

 The reorganization court rejected the Es-canaba’s argument that the NWRTC was an indispensable party-defendant to the proceeding. The reorganization court said that, while the NWRTC was the title-holder of the Connecting Line, the Escanaba operated the line and employed the personnel to do so and therefore had the obligation to the former Milwaukee employees under section 5(b) of the MRRA and Appendix B.
 

 The reorganization court accordingly denied the Escanaba’s motion to dismiss the RLEA’s complaint and overruled the Esca-naba’s objections to the motion of the RLE A to reopen and interpret Order No. 809. The reorganization court declared that the Escanaba was subject to the terms and provisions of Order No. 809 and to Appendix B with respect to the operation of the Connecting Line between Crivitz and Marinette, Wisconsin. This appeal followed.
 

 I.
 

 The validity or invalidity of the order of the reorganization court holding the Escanaba liable for Appendix B labor protection depends on whether the Escanaba’s acquisition of the Connecting Line is characterized as a post-bankruptcy transaction (i.e., whether the transaction was simply a transfer of a line of railroad from the Soo to the NWRTC). The alternative characterization is the one essentially found by the reorganization court: that the transfer was in effect, and for purposes of labor protection, from the bankruptcy Trustee to the Escanaba. Judge Marshall said that the Escanaba “stepped into the ... shoes” of the Soo — another way of finding a Trustee-Escanaba transfer. Judge Marshall additionally (and consistently) found that the Escanaba became the purchaser under the asset purchase agreement and “assumed the obligations of the Soo....” Only if there was in effect a transfer from the Trustee to the Escanaba, of course, could the reorganization court have jurisdiction and would section 5(b) of the MRRA and paragraph 10 of Order No. 809 be applicable. The Escanaba not surprisingly argues that the transfer was a post-bankruptcy transaction and that, therefore, the reorganization court lacked jurisdiction to impose labor protection, which was vested instead exclusively in the ICC.
 

 Viewing matters literally, the Escanaba has a perfectly plausible argument. In law at least it is not even the title-holder of the Connecting Line; NWRTC is. NWRTC received title through the Escanaba, which held an interest in the Connecting Line as a result of the arbitration panel’s decision that it might exercise its right of first refusal.
 

 The RLEA would have us regard this literal view as one of form only, with the substance being a transfer directly from the Milwaukee’s Trustee to the Escanaba. Under this analysis the interim holding by the Soo was merely a transitional condition ensuing from a mistaken decision by the Trustee, who had improperly refused to honor the Escanaba’s right of first refusal. We believe that a form and substance analysis here would be quite apt. But we think that perhaps an even more appropri
 
 *1193
 
 ate dichotomy would be that between law and equity, and, of course, a bankruptcy court acts essentially as a court of equity.
 
 [6]
 

 See In re Leasing Consultants, Inc.,
 
 592 F.2d 103, 107 (2d Cir.1979). Here legal title passed to the Soo and subsequently to the NWRTC, but, by reason of its right of first refusal, the Escanaba acquired an equitable interest in the Connecting Line triggered by the offers of the Northwestern and the Soo and by the Trustee’s negotiations with the Soo.
 
 Cf. Continental Cablevision of New England, Inc. v. United Broadcasting Co.,
 
 873 F.2d 717, 722 (4th Cir.1989) (right of first refusal creates equitable interest in holder); 1A A. Corbin,
 
 Corbin on Contracts,
 
 § 261, at 471 n. 13 (1963). Despite the mistaken conveyance of legal title to the Soo, the Escanaba was able to enforce its equitable interest through arbitration and by its tender of payment to obtain re-conveyance to its as-signee, the NWRTC. The interim transfer of title to the Soo was erroneous and an apparent breach of the trackage rights agreement between the Trustee of the Milwaukee and the Escanaba. The decision of the arbitration panel merely corrected the error. In fact, the arbitrators in their first decision of January 29, 1985, “directed” the Milwaukee Road “not to sell the Connecting Line without first giving the [Escana-ba] the opportunity to exercise its right of first refusal.” App. Exhibit D at 21. This was an authoritative statement of the proper course that the transaction should have taken and the one which ought to have governed the various parties and the reorganization court. Thus in regarding the relevant transfer as one in substance from the Trustee to the Escanaba the reorganization court was merely honoring not only the general dictates of equity but also the principles stated by the arbitrators, which ought properly to have governed the transaction as it affected the Connecting Line.
 

 We believe that the finding of the reorganization court that the Escanaba became the actual purchaser under the asset purchase agreement is quite justifiable. We should accord considerable deference to the district court in railroad reorganizations because each reorganization is unique and the law governing such cases is not, therefore, “absolute:”
 

 [E]very railroad reorganization is unique; the proceedings are equitable in nature and peculiar problems and claims invariably demand the attention of the reorganization court. Beyond the statutory requirement that a plan of reorganization be fair and equitable, there is little that may be regarded as absolute in the law governing railroad reorganizations.
 

 In the Matter of Penn Cent. Transp. Co.,
 
 596 F.2d 1127, 1148 (3d Cir.),
 
 cert. denied,
 
 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979).
 

 Were we to accept the argument of the Escanaba, we would be allowing an error by the Trustee in interpreting the trackage rights agreement to determine an important question of labor protection in the resolution of the Milwaukee bankruptcy. This would clearly be contrary to the policy of the MRRA, if not of the Bankruptcy Code itself. The Escanaba has consistently argued that it had an immediate right to the Connecting Line triggered by the offers of the Northwestern and the Soo. It enforced that right through arbitration. It cannot now be heard to reject the duty of labor protection that attached to the right to purchase the Line under the asset purchase agreement and under section 5(b) of the MRRA, 45 U.S.C. § 904(b)(1).
 

 The Escanaba makes a number of arguments to avoid the obligation of labor protection, most of which stand or fall on whether the transaction was a post-bankruptcy or a bankruptcy matter. Thus, the Escanaba contends that section 5(b) of the MRRA does not apply to “the Soo’s post-bankruptcy transfer of the Connecting Line to the NWRTC.” Escanaba Brief at 23. As we have noted, for present purposes we regard the transfer as in substance and effect, and in equity, one from the Trustee to the Escanaba.
 

 
 *1194
 
 The Escanaba argues that the Soo has undertaken labor protection obligations for the Connecting Line and there is therefore no need or place for the Escanaba to assume the same obligations. The Escana-ba contends that there will be duplicative protection. The Soo concedes that it has labor protection obligations extending to the Connecting Line but that this in no way precludes the Escanaba from having its own obligations. The Soo’s obligations are not before us on appeal nor is the relationship of the Soo’s and the Escanaba’s respective duties. We need only say that no employee is entitled to duplicative benefits as a result of the imposition of obligations on the two carriers. That two parties have responsibility for labor protection does not mean that each must provide the same protection to the same employees for the same reason and for the same periods. It is clear that duplicative protection should be avoided.
 

 The Escanaba further contends that the ICC had primary and exclusive jurisdiction to impose or not impose labor protection obligations on the sale of the Connecting Line to NWRTC. It is true that, in the absence of other controlling legislation, the ICC would have primary and exclusive jurisdiction to impose employee protective conditions. In enacting section 5(b) of the MRRA, however, Congress expressly conferred jurisdiction on the reorganization court to impose labor protective conditions on a sale or transfer of the Milwaukee’s lines.
 

 Certainly Congress may determine the jurisdiction of federal administrative agencies and Congressional limitations on agency powers are paramount.
 
 See Louisiana Public Service Comm’n v. Federal Communications Comm’n,
 
 476 U.S. 355, 374-75, 106 S.Ct. 1890, 1901-02, 90 L.Ed.2d 369 (1986).
 
 See also Board of Governors of the Fed. Reserve System v. Dimension Financial Corp.,
 
 474 U.S. 361, 365, 106 S.Ct. 681, 684, 88 L.Ed.2d 691 (1986). Judge Marshall correctly carried out his obligations in the reorganization proceeding by determining that section 5(b) of the MRRA was applicable because the Eseana-ba “stepped into the ... shoes” of the Soo and became the purchaser from the Trustee. Even the language of the Commission’s decision indicates a broad purpose not to interfere with the courts in areas reserved to the courts. Thus the ICC said:
 

 If there is a dispute in the courts over the right to acquire and operate a line, our action will not affect either parties’ rights and remedies.
 

 ICC Decision at 2; App. Exhibit F.
 

 It is true that, in accordance with section 5(b)(2) of the MRRA, 45 U.S.C. § 904(b)(2), the ICC had to approve a sale or transfer of Milwaukee assets. But this provision in no way limits the mandate of section 5(b)(1) of the MRRA, 45 U.S.C. § 904(b)(1), that the reorganization court impose labor protection. In fact, the ICC specifically stated in its decision of January 7,1986, that, “[i]n granting an exemption from 49 U.S.C. 10901, we are only removing a regulatory impediment....” The ICC had in mind no effort to interfere with the prerogatives of the courts, whatever they might be.
 

 Nor did the RLEA concede that the ICC rather than the reorganization court had the power to prescribe labor protective conditions. In its Opposition to the Petition for Exemption of NWRTC and the Escana-ba in the ICC proceeding, the RLEA asserted that section 5(b) of the MRRA governed the transfer of the Connecting Line to the NWRTC and the Escanaba.
 

 In addition, the Escanaba claims that the RLEA is collaterally estopped by the decision of the arbitration panel “regarding the ICC’s primary and exclusive jurisdiction on the subject of labor protection as between the [Escanaba] and the Soo, and, further, the ICC’s actual determination to decline to impose labor protection on the conveyance of the line from the Soo to NWRTC.” Escanaba Brief at 36. The RLEA claims that the Escanaba waived this argument in the district court and the Escanaba denies the waiver. In any event, the point is meritless. The RLEA was not a party or privy to the arbitration and cannot be estopped by anything decided there.
 
 See Kunzelman v. Thompson,
 
 799 F.2d 1172, 1176, 1178 (7th Cir.1986);
 
 Amer
 
 
 *1195
 

 ican Renaissance Lines, Inc. v. Saxis Steamship Co.,
 
 502 F.2d 674 (2d Cir.1974).
 
 Cf. Benjamin v. Traffic Executive Assoc. Eastern R.R.,
 
 869 F.2d 107, 110-14 (2d Cir.1989). Further, the statement of the arbitration panel that the power to impose labor protective conditions on the Escanaba is “vested solely” in the ICC is at best obiter dictum and, as has been noted earlier, is an incorrect statement of the law in the present circumstances. Section 5(b) of the MRRA is the controlling law here.
 

 In any event, the comments of both the arbitration panel and the ICC with respect to labor protection appear to be merely in the context of a transfer from the Soo to the Escanaba or to the NWRTC. As we have pointed out, however, this literal characterization of the transfer is not appropriate to the labor protection issue which is before us. Instead, the transfer as properly viewed from the Trustee to the Escana-ba is the appropriate frame of reference. This framework was not apparently considered by either the arbitrators or the ICC, and it is therefore questionable whether the issues before them and before the reorganization court were the same. For all these reasons, we reject both the arbitrators’ decision and the ICC decision as having any collateral estoppel effect on the reorganization court with respect to the imposition of labor protection.
 

 Further, the Escanaba argues that the RLEA’s effort to reopen and modify Order No. 809 to impose labor protective conditions on the Escanaba is for various reasons unlawful. Primarily, it argues that “[o]nce Sale Order No. 809 was implemented, that Order was not subject to be reopened, modified or collaterally attacked, in the Bankruptcy Court or elsewhere.” Escanaba Brief at 19. The Escanaba recognizes the existence of paragraph 11 of Order No. 809, in which the reorganization court specifically retained jurisdiction to consider disputes arising under or with respect to the asset purchase agreement or under Order No. 809 itself.
 
 See supra
 
 note 4. The Escanaba, however, argues that the reorganization court acted beyond the scope of its jurisdiction in “substantively altering] the otherwise final nature of Sale Order No. 809 in regard to the subject of labor protection.” Escanaba Brief at 19-20. The Escanaba relies on
 
 In the Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad Company,
 
 799 F.2d 317 (7th Cir.1986),
 
 cert. denied,
 
 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987), which dismissed as moot an effort of the RLEA to secure
 
 New York Dock
 
 labor protection conditions (as compared with Appendix B conditions) since such a change would “affect the sale” of the railroad assets in contravention of former Bankruptcy Rule 8-703(a)(6).
 
 [7]
 

 See
 
 799 F.2d at 329. In the cited case, this court ruled that under former Bankruptcy Rule 8-703(a)(6), since Order No. 809 had not been stayed pending appeal, the RLEA’s claim was moot.
 
 Id.
 
 at 329-31. On the other hand, in the present case the RLEA concedes that Appendix B is the appropriate measure of labor protection. Order No. 982, on appeal here, makes no change that “affects the sale” comparable with the one rejected in the earlier case. The adjustment made by Order No. 982 merely modifies or interprets Order No. 809 to reflect the change in the transfer of certain Core Assets resulting from the Es-canaba’s exercise of its right of first refusal upheld by arbitration. The logic of the labor protection provisions of Order No. 809 remains intact, but the burden of labor protection is appropriately applied to an additional purchaser whose right to purchase was judicially determined subsequent to the original entry of Order No. 809.
 

 The Escanaba now argues that Order No. 809 unalterably imposed labor protection requirements on the Soo with respect to the Connecting Line and that any additional imposition on the Escanaba is precluded under the logic of former Bankruptcy Rule 8-703(a)(6). Yet it was the Escana-ba’s assertion of its right of first refusal
 
 *1196
 
 that caused Order No. 809 to be modified to the extent that the Connecting Line was severed from the other Core Assets in the sale to the Soo. The Escanaba contends that “neither the RLEA, nor the Soo, has contradicted the fact that by virtue of Order No. 982 the Bankruptcy Court unlawfully tampered with the economic terms and conditions, set in final and binding arbitration, related to the sale of the Connecting Line from the Soo to NWRTC.” Escanaba Reply Brief at 5. But this suggestion of an unfair and arbitrary change in the terms of sale ignores the existence of section 5(b) of the MRRA and its application in Order No. 809, which put all purchasers, direct and
 
 indirect,
 
 of the Milwaukee properties on notice that labor protective conditions could be attached to their status as a “purchaser” of Milwaukee railroad assets. Both the arbitration panel and the ICC discussed the possibility of labor protection conditions and it eventually fell to the reorganization court to interpret Order No. 809 to extend to the Escana-ba the same conditions earlier and explicitly imposed on the Soo.
 

 The Escanaba also relies on our pri- or decision at 799 F.2d 317 for the proposition that, after the original entry of Order No. 809, the Milwaukee was no longer in the rail business and hence had no labor protection obligations which could be “retroactively” transferred to the Escana-ba. Escanaba Brief at 39-42. Since our analysis is based on the arbitral determination that the Escanaba had a right to purchase the Connecting Line at the time of the sale of all the Core Assets to the Soo, we do not believe that a subsequent loss of railroad status is of significance. By pursuing arbitration and exercising its right of first refusal, the Escanaba brought upon itself obligations which, under Order No. 809, had previously been exclusively the Soo’s.
 

 In its reply brief and in certain post-oral argument motions, the Escanaba suggests that this appeal from Order No. 982 is moot because, ostensibly, any affected employees who may have been adversely impacted have either retired from the Soo, taken voluntary separation allowances from the Soo or voluntarily transferred to the Wisconsin Central Railroad, all before entry of Order No. 982. Hence, the Escanaba submits, there are no further claims for labor protection benefits. The status of the record does not make it possible for us to fully evaluate these contentions although they may be relevant to any implementation of Order No. 982. In any event, we see no basis in the record for a finding of mootness.
 

 AFFIRMED.
 
 [8]
 

 [1]
 

 . The Connecting Line also includes trackage rights of the Milwaukee on the tracks of the Chicago & Northwestern Railroad between Mar-inette and Menominee, Michigan. With those trackage rights, the Milwaukee could move traffic between Crivitz and Menominee. As indicated,
 
 infra,
 
 the Milwaukee also obtained track-age rights between Crivitz and Green Bay, Wisconsin (over the Escanaba & Lake Superior Railroad).
 

 [2]
 

 . This is Appendix B to the Report of the Special Master, dated February 20, 1980.
 

 [3]
 

 . Paragraph 10 of Order No. 809 states:
 

 Subject to the agreement of Soo and SLRCO [a wholly owned subsidiary of the Soo] with representatives of employees to labor protective conditions at least as protective as those specified below, the conditions contained in Appendix B to the Report of the Special Master dated February 20, 1980, are adopted for the protection of employees of Soo and Milwaukee Road affected by the transactions contemplated by the APA; Section 4(e) is included therein as specified in Order No. 276B; Appendix B is also modified as provided in Order No. 409A. Notwithstanding the foregoing, no labor protective conditions are imposed with respect to the employees of the Milwaukee Motor Transportation Company.
 

 Order No. 809 at 12; App. Exhibit C.
 

 [4]
 

 .The language of paragraph 11 is as follows:
 

 That the Court shall retain jurisdiction over this matter for the purpose of implementing and carrying out the APA and resolving any disputes arising under or with respect to the APA, this Order or the Closing. The ICC shall have such continuing jurisdiction over this transaction as is by law vested in it.
 

 Order No. 809 at 12; App. Exhibit C.
 

 [5]
 

 . Title 45 U.S.C. section 904(b)(1) provides: Upon the occurrence of an event described in section 920(b) of this title, or on April 1, 1980, whichever first occurs, the bankruptcy court may authorize the sale or transfer of a line of the Milwaukee Railroad to be used in continued rail operation, subject to the approval of the Commission under paragraph (2) of this subsection. In authorizing any such sale or transfer, the court shall provide a fair arrangement at least as protective of the interest of employees as that required under section 11347 of Title 49.
 

 [6]
 

 . The RLEA made an argument based on law and equity in the district court.
 

 [7]
 

 . Former Bankruptcy Rule 8-703(a)(6) provided:
 

 Unless an order approving a sale of property ... is stayed pending appeal, the sale to a good faith purchaser ... shall not be affected by the reversal or modification of such order on appeal, whether or not the purchaser ... knows of the pendency of the appeal.
 

 [8]
 

 . The motion by the RLEA to sanction the Esca-naba for filing a motion to show cause relating to mootness is denied.