In the Matter of CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY,*

Appeal of WASHINGTON STATE DEPARTMENT OF TRANSPORTATION.

No. 91–2172.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1992.

Decided Aug. 18, 1992.

As Amended Aug. 25, 1992.

---

* CMC Heartland Partners is the successor to Chicago, Milwaukee, St. Paul & Pacific Railroad Company, and technically the caption in this case should probably be *In the Matter of: CMC Heartland Partners.* Nonetheless, we have retained the designation listed on the docket sheet and used by the parties in their filings.

Kenneth O. Eikenberry, Deborah L. Cade (argued), Charles F. Secrest, Susan Jensen, Olympia, Wash., for appellant.

Daniel R. Murray, Randall E. Mehrberg, Jerold S. Solovy, Barry Sullivan (argued), Robert P. Zapinski, Jenner & Block, Chicago, Ill., for appellees.

James B. Burns, Edward R. Gower, Keck, Mahin & Cate, Chicago, Ill., Daniel R. Murray, Randall E. Mehrberg, Jerold S. Solovy, Barry Sullivan, Terrence J. Truax, Jenner & Block, Chicago, Ill., Charles Stark, I.Co., Office of Gen. Counsel, Washington, D.C., Milton H. Gray, Altheimer & Gray, James T. Malysiak, Freeman, Freeman & Salzman, Terry F. Moritz, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Marvin F. Metge, F. Rausch, Gorham, Metge, Bowman & Hourigan, Chicago, Ill., William G. Mahoney, Highsaw, Mahoney & Clarke, Washington, D.C., Carlton G. Salmons, Austin & Gaudineer, Des Moines, Iowa, J.S. Thiel, Dept. of Transp., Madison, Wis., Patrick J. McPartland, Minneapolis, Minn., Peter J. Kilchenmann, John W. Rowe, Isham, Lincoln & Beale, Michael L. Gesas, Gesas, Pilati & Gesas, Lynn A. Goldstein, First Nat. Bank of Chicago, Harold L. Kaplan, Mayer, Brown & Platt, Chicago, Ill., for debtor.

Before BAUER, Chief Judge, KANNE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

The interface of bankruptcy laws and environmental laws has perplexed courts since the passage of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Years after the close of the bankruptcy reorganization of Chicago, Milwaukee, St. Paul & Pacific Railroad Company ("Milwaukee Road"), the Washington State Department of Transportation ("WSDOT") filed a CERCLA claim against Milwaukee Road's successor. This case requires us to balance the policies underlying the bankruptcy laws and CERCLA in order to determine whether WSDOT had a claim or contingent claim which should have been filed before the close of bankruptcy. The district court concluded that WSDOT had such a claim. The district court then went on to conclude that WSDOT is now precluded from bringing this belated action. We affirm.

## I.

On December 19, 1977, Milwaukee Road petitioned for reorganization pursuant to Section 77 of the Bankruptcy Act of 1898, formerly 11 U.S.C. § 205 (1976) (repealed 1978). The United States District Court for the Northern District of Illinois served as the reorganization court.

In accordance with Section 77 of the Bankruptcy Act of 1898, the reorganization court established deadlines, or bar dates, for the filing of claims against Milwaukee Road, the estate, and its trustee. The first bar date relevant to this proceeding was set for September 10, 1985. This was the deadline for all post-petition claims (claims arising against Milwaukee Road during the period of reorganization). Notice of this bar date was sent to the Washington State Department of Revenue, and notice was published in *The Wall Street Journal*.

On November 12, 1985, the reorganization court entered a consummation order. This order became effective on November 25, 1985, the consummation date. The consummation order set forth a new bar date of December 26, 1985, for claims that arose between the prior September 10th bar date

and the November 25th consummation date. This order bars and forever discharges all untimely claims against the trustee, Milwaukee Road, and Milwaukee Road's successors and assigns.

WSDOT incurred environmental cleanup costs on property located in Tacoma, Washington, that it purchased from Milwaukee Road's trustee in 1984. In 1979 one of Milwaukee Road's trains carrying copper ore derailed on this property near the intersection of Brown and Haley. Apparently, it is this spill that lead to the contamination and need for cleanup on the Tacoma property. According to WSDOT's exhibits, Washington State Department of Ecology ("WSDOE") knew about this contamination problem by June or July of 1985. In fact, WSDOE took soil samples at this site on June 11, 1985. WSDOE then had a bioassay test performed on these samples. WSDOE received the bioassay test results in July of 1985.

Then, on August 13, 1985, a WSDOE employee informed David R. Thompson, a WSDOT engineer, of this contamination problem. According to phone records, WSDOE informed Thompson in this phone conversation that there had been a spill of hazardous materials including copper and arsenic; the spill resulted from a train wreck near Brown and Haley; a bioassay test had been performed; and further exploration and testing would be necessary. Then, on August 16, 1985, WSDOE sent a letter to WSDOT further apprising WSDOT of the situation. This letter, like the prior phone conversation, links the problem to a train derailment. Furthermore, in this letter WSDOE informed WSDOT that the contaminant was likely copper ore and that this contaminant was an extremely hazardous waste which would need to be treated, stored, and/or disposed at a permitted hazardous waste facility. Then, around October 17, 1985, WSDOT and WSDOE had soil samples taken in the contaminated area. The samples were forwarded to a testing laboratory on October

21, 1985. According to Thompson's affidavit and WSDOT's briefs, WSDOT received some preliminary results from these tests on November 13, 1985, and the laboratory completed and sent to WSDOT the final results on November 26, 1985.

Despite the fact that WSDOT was well informed that a train derailment resulted in a contamination problem that would require treatment, removal, and/or storage costs, neither WSDOT nor the State of Washington [1] filed a proof of claim with the bankruptcy court before the December 26, 1985, bar date. Indeed, neither WSDOT nor the State of Washington took any action until August 4, 1989, when WSDOT filed a complaint in the United States District Court for the Western District of Washington against CMC Real Estate Corporation, now CMC Heartland Partners ("CMC"), a successor to Milwaukee Road. This complaint asks for recovery of cleanup costs and damages under CERCLA. This complaint also asserts state law claims for misrepresentation and unjust enrichment.

On June 19, 1990, CMC filed a Petition for Injunctive Relief with the United States District Court for the Northern District of Illinois, Eastern Division—the reorganization court. In its petition, CMC asked the court to enforce the consummation order's continuing injunction against late-filed claims. The district court, asserting its retained jurisdiction as the Milwaukee Road reorganization court, granted this petition and enjoined WSDOT from pursuing the Washington lawsuit against CMC on the grounds that its consummation order discharged the claims on which the suit was based.

In granting this injunction, the district court concluded that the State of Washington, which it considered the relevant party, had a CERCLA claim before the September 10, 1985, bar date. Alternatively, the district court concluded that even if there was no claim before September 10, 1985, WSDOT or the State of Washington had a

---

1. One of the issues in contention is whether the State of Washington is the relevant party for purposes of the CERCLA claim at issue, or whether WSDOT, an agency for the State of Washington, constitutes a party apart from the State. Section II of this opinion contains a more thorough discussion of this issue.

claim that should have been filed before the December 26, 1985, bar date, and if not filed by December 26, 1985, the district court indicated that WSDOT or the State of Washington could have asked for leave to file a late claim within a reasonable time after the close of bankruptcy. The district court also concluded that the claims for unjust enrichment and misrepresentation existed prior to the bar date and there was no reason why those claims had not been pursued during the reorganization.

Not only did the district court reject WSDOT's argument that it did not have a claim subject to discharge, the district court also rejected WSDOT's argument that the trustee failed to provide WSDOT with sufficient notice of the applicable bankruptcy bar dates. First, the district court concluded that the trustee was not required to give WSDOT actual notice because there was no indication that the trustee knew there had been a release of a hazardous substance or that cleanup was necessary. Second, the district court concluded that the notice given to the Washington State Department of Revenue constituted actual notice to the relevant party—the State of Washington. Finally, the reorganization court denied WSDOT's motion to transfer venue. We affirm.

## II.

### A. *Claim or Contingent Claim*

CERCLA and the Bankruptcy Act are two sweeping statutes both with very important purposes. The problem is that the goals underlying these statutes do not always coincide. Bankruptcy laws serve an important purpose of equitably distributing an insolvent debtor's funds in hopes of maximizing the creditor's interests in receiving payment and the debtor's interest in a fresh start. *See In re Chateaugay Corp.*, 944 F.2d 997, 1002 (2d Cir.1991) (*"LTV"*). The bankruptcy court cannot adequately evaluate whether a reorganization plan is fair and equitable unless the bankruptcy court is apprised of all claims against the debtor. Moreover, bankruptcy's goal of giving debtors a fresh start would be frustrated if creditors who failed

to file timely claims tried to bring claims against a reorganized company after the close of bankruptcy. For this reason, the timely filing of claims is vital to the purposes underlying bankruptcy.

. Just as important interests underlie the bankruptcy laws, laudable goals also underlie CERCLA—namely, protecting this nation's environment by distributing the costs associated with cleaning up sites containing hazardous materials. *See id.* In order to encourage cleanup and to distribute the costs of cleanup, CERCLA's strict liability provisions make a broad category of parties responsible for cleanup costs. *See* 42 U.S.C. §§ 9607(a), 9601(21). Prematurely cutting off a party's ability to recover for CERCLA cleanup costs could impede CERCLA's cost-distribution scheme. And for this reason, the bankruptcy court's interest in having all claims before it as early as possible sometimes conflicts with the cleanup process envisioned in CERCLA. This case involves a question at the heart of this tension: at what point does a party have a CERCLA claim for purposes of bankruptcy so that the failure to raise the claim before bankruptcy bar dates forever bars the claim from being brought against the successors to a reorganized company? Fortunately on these particular facts we can resolve this question in a manner that seems to comport with the policies underlying both CERCLA and the Bankruptcy Act.

As CMC correctly points out, we give great deference to a reorganization court's bankruptcy decisions because a reorganization court acts in equity. *In re Chicago, Milwaukee, St. Paul, and Pac. R.R. Co.*, 882 F.2d 1188, 1193 (7th Cir.1989) (*"Escanaba"*). CMC also correctly points out that we give deference to a court's interpretation of its own orders. *In re Chicago Rock Island and Pac. R.R. Co.*, 860 F.2d 267, 272 (7th Cir.1988). Because the district court's entry of an injunction in this case was both a bankruptcy decision and an interpretation of its prior consummation order, we review the court's decision to bar WSDOT's claims for abuse of discretion. Nonetheless, in applying the abuse of discretion standard, we do not

give equal deference to every aspect of a court's decision. The abuse of discretion standard is used to evaluate the reorganization court's application of the facts to the appropriate legal standard, and the factual findings and legal conclusions underlying such decisions are evaluated under the clearly erroneous and *de novo* standards, respectively. *Govas v. Chalmers*, 965 F.2d 298, 301 (7th Cir.1992) (applied the clearly erroneous standard to underlying factual findings when evaluating a district court decision for abuse of discretion); and *see In re Jensen*, 127 B.R. 27, 29 (9th Cir. BAP 1991) (determining when a CERCLA claim arises for purposes of bankruptcy is a question of law reviewed *de novo*). And, to the extent this case involves the purely legal question of what constitutes the appropriate standard for determining when a CERCLA claim arises under the 1898 Bankruptcy Act, we proceed *de novo. Jensen*, 127 B.R. at 29.

Because Milwaukee Road filed its petition for reorganization prior to the passage of the Bankruptcy Reform Act of 1978 (the "Bankruptcy Code"), the Bankruptcy Act of 1898 governs this case. *In the Matter of Chicago, Milwaukee, St. Paul and Pac. R.R. Co.*, 878 F.2d 182 (7th Cir.1989) (*"CMC Real Estate Corp."*). Section 77 of the 1898 Act, 11 U.S.C. § 205 (repealed 1978), governs railroad reorganization proceedings. It is this section which governed the Milwaukee Road bankruptcy, and it is this section which governs the current dispute.

Section 77 "clearly provides broad authorization for the discharge in bankruptcy of claims against the debtor in order to secure a fresh start for a company resulting from a [S]ection 77 reorganization." *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 941 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). In order to give the debtor this fresh start, Section 77(f) makes the provisions of a confirmed bankruptcy plan "binding upon the debtor ... all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and, if filed whether or not approved, including creditors who have not,

as well as those who have accepted it." 11 U.S.C. § 205(f) (repealed 1978). Section 77(f) further provides that the debtor and its successor corporations emerge from bankruptcy "free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities." *Id.* And, Section 77(b) broadly defines creditors to include "all holders of claims of whatever character against the debtor or its property, whether or not such claims would otherwise constitute provable claims under this Act." 11 U.S.C. § 205(b) (repealed 1978). Finally, Section 77(b) broadly defines claims to include "debts, whether liquidated or unliquidated ... or other interests of whatever character." *Id.*

■ The consummation order entered in the Milwaukee Road bankruptcy set a September 10, 1985, bar date for all claims arising before that date, and a December 26, 1985, bar date for claims arising after September 10, 1985, and before November 25, 1985—the consummation date. Under the above quoted language, it is clear that a creditor who fails to file a preconsummation claim before the applicable bar dates is forever discharged from raising this claim against the debtor or its successors. 11 U.S.C. § 205(f) (repealed 1978); *In re Penn Central Transp. Co.*, 944 F.2d 164, 168 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). Moreover, the consummation order in the Milwaukee Road bankruptcy also makes it clear that preconsummation claims not brought before the December 26, 1985, bar date could not later be brought against the successor companies. Considering that CMC is the successor to Milwaukee Road, this consummation order relieves CMC of all claims that should have been raised against Milwaukee Road during these bankruptcy proceedings. This brings us to the heart of the dispute: whether WSDOT or the State of Washington had a preconsummation claim or contingent claim that should have been raised before the December 26, 1985, bar date?

It is clear that a cause of action constitutes a claim under Section 77. *See CMC*

*Real Estate Corp.*, 878 F.2d at 184. The problem is that it is not always clear at what point a party has a cause of action. This uncertainty is particularly poignant when we consider this court's suggestion in dicta that a cause of action may exist before it accrues. *In re UNR Ind., Inc.*, 725 F.2d 1111, 1119 (7th Cir.1984). To further this confusion, courts have pointed to Section 77's broad definition of claims as "interests of whatever character" and creditors as holders of "claims of whatever character ... whether or not provable" to conclude that a party may have preconsummation "contingent claim" which must be raised in order to avoid discharge under Section 77 even before the party has a cause of action. *Schweitzer*, 758 F.2d at 942 (citing *In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22, 22–27 (2d Cir.), *cert. denied*, 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519 (1939)). Just as it is not always clear at what point a party has an actual claim, it is often less clear when a party has a contingent claim. This uncertainty is amplified by the fact that the determination of when a party has a claim or contingent claim seems to hinge on the nature of the claim and the posture of the case.

The fact that the answer to this question depends upon the nature of the claim can be seen when comparing the courts' treatment of contract and tort claims. That is, courts seem more likely to hold that a party has a claim or contingent claim when dealing with actions in contract as opposed to actions in tort. *Compare In re Radio–Keith*, 106 F.2d at 26–27 and *Schweitzer*, 758 F.2d at 942–44. *See also LTV*, 944 F.2d at 1003–05 (discussion regarding the differential treatment of tort and contract claims). The *Schweitzer* court indicated that this differential treatment is justified for several reasons, one being that a tort claimant, unlike the contractual claimant, is not always aware that it has a legal relationship with the debtor which gives rise to

the claim until years after the tortious act. *Schweitzer*, 758 F.2d at 943.

■ As we mentioned, the analysis of what constitutes a claim or contingent claim also seems to vary depending upon the posture of the case. In order to understand this point a little background is necessary. Just as Section 77 of the 1898 Act broadly defines claims, the new Bankruptcy Code also broadly defines claims. *Compare* 11 U.S.C. § 205(b) (repealed 1978) and 11 U.S.C. § 101(4)(A) and (B) (enacted 1978). *See also LTV*, 944 F.2d at 1005. And, as such, contingent claims are found to fall within many of the new Code's provisions. However, in order to obtain discharge under Chapter 7 of the Code the party not only need have a contingent claim before the applicable bar dates, but this claim must constitute a prepetition claim. *See* 11 U.S.C. § 727; *Jensen*, 127 B.R. at 29.[2] Furthermore, whether a party has a sufficient relationship to give rise to a prepetition claim is also relevant to the Code's broad automatic stay provisions which are applicable in Chapter 7, 11 and 13 bankruptcies. *See* 11 U.S.C. § 362. Finally, whether a creditor has a prepetition versus a postpetition claim is relevant to the classification of claims under the Bankruptcy Code. In other words, one possible effect of classifying a claim as a postpetition claim, rather than a prepetition claim, is that it might receive a priority classification as an administrative expense. *See* 11 U.S.C. § 503(b); *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 123–24 (6th Cir.1987) (classifying postpetition CERCLA response costs as administrative expenses).

The problem is that years may pass between the filing of the bankruptcy petition and the close of bankruptcy—the consummation date. In these years the posture of the possible claimants may also change drastically, and with this change in posture comes a change in the policies underlying the question of when a claim arises. A good example of this can be seen in tort

---

**2.** The Court of Appeals for the Second Circuit has indicated that there is a similar requirement in the Chapter 11 context. That is, that court indicated that a contingent claim is subject to discharge in a Chapter 11 proceeding only if it

results from prepetition conduct which fairly gives rise to that claim. *LTV*, 944 F.2d at 1005 (citing *In re Chateaugay*, 112 B.R. 513, 521 (S.D.N.Y.1990) ("*LTV*")).

cases. A debtor may perform a tortious act before it files a bankruptcy petition, but the tort victim may not be aware of any injury resulting from this tortious act until after the debtor files its petition. Although not aware of these injuries before the debtor files its bankruptcy petition, suppose the victim discovers these injuries before the close of bankruptcy. Because for the most part only prepetition claims are dischargeable in Chapter 7 bankruptcies and subject to automatic stay in Chapter 7, 11, or 13 bankruptcies, the question then becomes whether the tort victim had a prepetition claim subject to the discharge and/or stay provisions. Considering that a bankruptcy court can more equitably distribute property and assure the debtor a fresh start if all claims are before it, considering that little benefit will be gained by allowing a person who knows it has a claim to pursue the claim outside of bankruptcy or to sit on the claim until after bankruptcy, and considering that granting a priority classification as an administrative expense to any such debts would impinge on the bankruptcy court's ability to equitably distribute limited funds among numerous creditors, it is not surprising that several courts in this posture have held that the claim arose for purposes of bankruptcy at the earliest point possible—the point in which the tortious act occurred. *See In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) (defective goods purchased prepetition and defective condition arguably discovered prepetition; held parties had prepetition claims that arose at the time in which the defective goods were delivered, and therefore automatic stay applied to the parties' claims); *In re A.H. Robins Co.,* 63 B.R. 986 (Bankr.E.D.Va. 1986) (involved a prepetition insertion of a Dalkon Shield intrauterine device; the injury resulting from the device occurred after the filing of the petition, but the party knew about the injury before the close of bankruptcy; held claim arose prepetition when the Dalkon Shield was inserted; therefore, claim subject to automatic stay); and *In re Edge,* 60 B.R. 690 (Bankr. M.D.Tenn.1986) (dentists performed a prepetition negligent act; injury resulting

from this negligence discovered after the filing of a bankruptcy petition but before the close of bankruptcy; held automatic stay applied to negligence claims).

However, when the posture is changed, the equities arguably run the other way. For example, suppose this same tort victim, who was the subject of a prepetition tortious act, incurs an injury which surfaces *after* the close of bankruptcy. In this situation, the question becomes whether the victim had a claim or contingent claim that arose before the close of bankruptcy. If a court holds that the victim had a claim or contingent claim upon the occurrence of the underlying tortious act, a victim who did not know that it had a potential claim would be forever barred from raising this claim against the individual debtor, reorganized company, or its successors. In such situations, a court may be less likely to conclude that the party had a claim or contingent claim dischargeable in bankruptcy. *See Schweitzer,* 758 F.2d at 940–44 (asbestos victims exposed to asbestos while working for railroad companies that later underwent Section 77 reorganization; the injuries resulting from this exposure surfaced after the close of bankruptcy; held no claims or contingent claims until the injuries were discovered, and therefore claims were post-consummation claims not discharged in bankruptcy).

## 1. Possible Legal Standards

■ The issue of when a CERCLA claim arises for purposes of bankruptcy is not entirely a new question for this court. That is, this issue came up to a limited extent in *In re CMC Heartland Partners,* 966 F.2d 1143 (7th Cir.1992). Ironically, that recent decision involved this same Milwaukee Road bankruptcy, but that case involved a different contaminated site. In that case, years after the close of the Milwaukee Road bankruptcy, the EPA issued an order under Section 106(a) of CERCLA, requiring CMC, Milwaukee Road's successor and the current owner of the contaminated site, to clean up that site. *See* 42 U.S.C. § 9606(a). CMC argued in that case that because the EPA had placed this site

then owned by Milwaukee Road on the National Priorities List a year before the relevant bankruptcy bar dates, any CERCLA actions against CMC as an owner or operator were discharged by the entry of the Milwaukee Road consummation order. *CMC Heartland Partners*, 966 F.2d at 1145–1146. The discussion in that case did not focus so much on whether the EPA had a CERCLA claim that arose before the close of bankruptcy. Rather, in that case this court quickly concluded that EPA had a preconsummation CERCLA claim and then moved to the focal point of that decision: whether CMC could be liable under Section 106(a) as a current owner of the site in question. *Id.* at 1146–1148. In that case we held that CMC could be liable for such costs if harmful or threatened releases at this site continued after the close of bankruptcy.

In that case, although we mentioned that Section 77 broadly defines claims and that EPA knew of the environmental problem on the Milwaukee Road property at least a year before the bankruptcy bar dates when the site was placed on the National Priorities List, we did not principally focus on the issue of when a claim or contingent CERCLA claim arises under Section 77. In the case before us today, CMC is clearly not a current owner or operator of the contaminated site at issue, nor was CMC an owner or operator of this site at any time after the entry of the bankruptcy consummation order, meaning that this dispute turns on the issue of when the CERCLA claim or contingent claim arose for purposes of bankruptcy. Moreover, *CMC Heartland Partners* involved the issue of when the EPA had a claim dischargeable in bankruptcy. Considering that when there is a grave endangerment to public health or welfare because of an actual or threatened release of a hazardous substance Section 106(a) of CERCLA gives EPA the authority to grant the necessary relief, it may be that the EPA has a claim or contingent CERCLA claim for purposes of bankruptcy at an earlier point than would a state or state agency. *See* 42 U.S.C. § 9606(a). For these reasons, we find it necessary to fully analyze when this CERCLA claim arose for purposes of a Section 77 bankruptcy.

Other courts have entertained thorough discussions of when a CERCLA claim arises for purposes of bankruptcy. The problem is that we cannot easily glean a standard from these decisions because the courts have announced varying standards for determining when such a claim arises for purposes of bankruptcy. Nonetheless, as we explain below, this divergence might be somewhat attributable to the varied posture of these cases.

In this case the consummation order applies equally to prepetition and postpetition claims that arose before the close of bankruptcy. As such, whether any claim that WSDOT might have had arose prepetition or postpetition is not at issue. Rather, the dispute in this case centers on whether WSDOT had a claim or contingent claim sometime before the close of the Milwaukee Road bankruptcy. Accordingly, although instructive, those cases involving the question of whether the parties have a sufficient prepetition claim raise different concerns than this case. Indeed, it is on this basis that the *Jensen* and the *LTV* decisions can be distinguished.

The bankruptcy appellate panel in *Jensen* held that a claim arises under Chapter 7 as soon as there is a release or threatened release of hazardous waste. *Jensen*, 127 B.R. at 32–33. The dispute in *Jensen* centered on whether or not the State of California Department of Health Services ("DHS") had a prepetition claim, not on whether DHS had a preconsummation claim. In *Jensen* the State of California Regional Water Quality Control Board (the "Board") requested DHS's assistance with regard to a potential hazardous waste problem. The Board made this request in March of 1984. *Id.* at 33 (Appendix). This was four months before the Jensens were discharged from debts and nearly one year before the close of the Jensens' personal bankruptcy. *Id.* at 33–34 (Appendix). Then in May of 1984, two months before the Jensens' discharge and nine months before the close of the Jensen bankruptcy, DHS assisted in the removal of a tank

which was apparently associated with the leakage problem. *Id.* at 34 (Appendix). Based on these facts, it appears that DHS, the party trying to assert the post-consummation claim, had some knowledge of the Jensens' connection to a release or threatened release of the hazardous substance before the close of the bankruptcy.

The *LTV* decision also contains language arguably indicating that a CERCLA claim arises for purposes of bankruptcy upon the release or threatened release of a hazardous substance. *See LTV,* 944 F.2d at 1005. However, any such suggestion must be read in the context in which it was made. In *LTV* the Environmental Protection Agency ("EPA") sought a declaratory judgment in the midst of a bankruptcy proceeding. More specifically, EPA sought guidance as to whether its CERCLA claims against a known responsible party as defined in CERCLA were covered in bankruptcy or whether these were claims which would be addressed after the close of bankruptcy. In that case, before indicating that the release or threatened release constituted a sufficient prepetition relationship to support a contingent claim, the Court of Appeals for the Second Circuit specifically noted that EPA knew that it had CERCLA claims against LTV for contamination at some of LTV's sites. *Id.* at 1005. And, although EPA did not know the exact location of these sites, the court noted that the relationship between the regulatory agency, EPA, and the entity regulated was sufficient to bring into contemplation the nature of response costs that would be incurred. *Id.*

In short, the *LTV* and *Jensen* decisions involved claimants who had some knowledge about the release or threatened release of a hazardous substance and who

had some idea that the bankruptcy debtor was a potentially responsible party under CERCLA. In short, the creditors in those cases knew they had potential CERCLA claims before the close of the bankruptcy proceedings. And, in those cases, any indication that a CERCLA claim arises for purposes of bankruptcy at the time of the release or threatened release of a hazardous substance was made in response to the question of whether or not the parties had a prepetition claim.[3] Although knowledge was not at issue in the *LTV* and *Jensen* analyses of whether the creditors had a prepetition claim, knowledge might be an important consideration when determining whether a party has a preconsummation claim. As such, we see no reason in the context of this case to adopt a standard which has the potential of cutting off future creditors' claims even though these creditors had no reason to know about the release or threatened release of a hazardous substance.[4]

Next, we have the *Penn Central* case. That case, like this case, involved the question of when a CERCLA claim arises under Section 77 of the 1898 Bankruptcy Act. And, in that case the Court of Appeals for the Third Circuit held that a creditor's CERCLA claim was not discharged even though the creditor failed to file a proof of claim before the close of bankruptcy. *Penn Central,* 944 F.2d at 167–68. It is important to note, however, that the consummation order at issue in *Penn Central* was adopted *before* CERCLA's enactment, and the *Penn Central* court heavily relied on this fact in concluding that the consummation order did not discharge the CERCLA claim at issue. *Id. See also United States v. Serafini,* 135 B.R. 219, 221 (M.D.Pa.1991) (followed *Penn Central* and

---

**3.** Knowledge of the potential CERCLA claim against Milwaukee Road also was not at issue in *CMC Heartland Partners* because the EPA placed a site then-owned by Milwaukee Road on the National Priorities List a year before the relevant bar dates. *CMC Heartland Partners,* 966 F.2d at 1145.

**4.** We have recently become aware of a law review note regarding the discharge of CERCLA claims. Kevin J. Saville, *Note: Discharging CERCLA Liability in Bankruptcy: When Does a*

*Claim Arise?,* 76 Minn.L.Rev. 327 (December 1991). This note proposes a foreseeability standard for determining when a CERCLA claim is dischargeable in bankruptcy. Although, we were not aware of this note when writing this decision, this note supports our conclusion that courts seem more willing to hold that a claim arises at an early point for purposes of bankruptcy when knowledge of this claim is not at issue. *See id.* at 349.

concluded that CERCLA claim not discharged by a bankruptcy proceeding that closed before CERCLA's enactment). In this case, the district court rendered the consummation order after CERCLA's enactment, and therefore the *Penn Central* analysis is of limited significance to this appeal.

Finally, we come to the district court decision in *United States v. Union Scrap Iron & Metal,* 123 B.R. 831 (D.Minn.1990). The *Union Scrap* court, unlike the *LTV* and *Jensen* courts, focused on whether a party had a preconsummation CERCLA claim which should have been raised before the applicable bar dates. And for this reason, the issues discussed in *Union Scrap* are analogous to the issues in this case.

In *Union Scrap* EPA sought to recover CERCLA response costs from Taracorp Industries, Inc. ("Taracorp"). EPA, however, brought this action for CERCLA response costs years after the confirmation of Taracorp's Chapter 11 bankruptcy plan and the close of Taracorp's bankruptcy proceedings. *Union Scrap,* 123 B.R. at 833. Taracorp did not own the hazardous site at issue in *Union Scrap.* Rather, Union Scrap Iron & Metal owned this site. And, although it appears that EPA had begun to investigate the hazardous site before the close of Taracorp's bankruptcy, EPA did not know that Taracorp had any relation to this site until 1989, nearly four years after the close of the Taracorp bankruptcy. *Id.* at 833–34. That is, EPA did not know that Taracorp had contracted with Union Scrap for the processing of battery plates stored at this site. *Id.*

The *Union Scrap* court concluded that a party does not have a CERCLA claim until the party incurs response costs. Relying on this rule, the *Union Scrap* court concluded that the consummation order did not bar EPA's claim for CERCLA cleanup costs. *Id.* at 838. WSDOT urges that we adopt the *Union Scrap* rule and hold that a party must incur response costs before it has a CERCLA claim which must be raised in a Section 77 bankruptcy to avoid discharge. WSDOT argues that CERCLA's language supports such a conclusion. Under CERCLA a party has a CERCLA cost-recovery action against a covered person once there is a release of a hazardous substance from a facility which causes the party to incur response costs. *United States v. Northernaire Plating Co.,* 670 F.Supp. 742, 746–47 (W.D.Mich.1987). WSDOT argues that because a party must incur response costs in order to have a CERCLA cause of action, a party likewise must incur response costs before it has a dischargeable claim for purposes of Section 77. We agree that CERCLA is the starting point for determining when a CERCLA claim arises in a Section 77 bankruptcy. The problem, however, is that parties are often obligated to bring contingent claims in order to avoid discharge in a Section 77 proceeding, and as such the fact that response costs are necessary for an actual claim to accrue under CERCLA does not necessarily mean that such costs are necessary for a contingent CERCLA claim to accrue under Section 77.

We recognize that the *Union Scrap* decision evaluates issues analogous to those in this case. Moreover, we agree that the result reached in *Union Scrap* is arguably justified on the basis that EPA did not know until years after the close of the Taracorp bankruptcy that Taracorp was a responsible party for CERCLA cleanup costs. Nonetheless, the requirement that a party must incur response costs before it has a CERCLA claim does not seem necessary to this result. Indeed, the court that rendered the *Union Scrap* decision has apparently recognized that such a rule was unnecessary to this result because in a later decision also involving a creditor who was not aware of the debtor's relationship to a known hazardous site until after the close of bankruptcy the court shifted its emphasis from whether the creditor incurred response costs to whether the creditor had knowledge of its claim before the close of bankruptcy. *Sylvester Bros. v. Burlington Northern R.R.,* 133 B.R. 648, 653 (D.Minn.1991) ("When the debtor has not disclosed its potential CERCLA ... liabilities in long-since closed bankruptcy proceedings, and the governmental agency has not had actual knowledge of the potential

claim in sufficient time to file a claim in those proceedings, the potential CERCLA ... liability is not discharged.").

Not only is a rule requiring response costs unnecessary to the *Union Scrap* decision, but it also has its problems. First, such a rule seems to ignore the fact that parties are often required to file contingent claims in order to avoid discharge. Second, this rule arguably gives the creditor too much control over the accrual of its claim. That is, such a rule might encourage a responsible person under CERCLA to postpone response costs until the close of bankruptcy. Encouraging such stall tactics would not only frustrate the bankruptcy court's interest in having all claims before it and the debtor's interest in a fresh start, but it would frustrate CERCLA's interest in a speedy cleanup of hazardous sites.

Just as it was unnecessary for the *Union Scrap* court to derive such a rule that would make the ability to discharge CERCLA claims in the bankruptcy context forever dependent on whether a party first incurs response costs, we find that it is unnecessary to set forth such a rule in this case.[5] For this reason, rather than adopting such a rule, or any rule, we explain below that when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim for purposes of Section 77.

### 2. Evaluation of the Facts

■ CMC argues that this is an easy case even under WSDOT's proposed standard for determining when a CERCLA claim arises under Section 77. That is,

CMC argues that the CERCLA claim at issue clearly arose before the applicable bar dates because response costs were incurred before these dates. CMC's first argument in this respect follows the district court's opinion. That is, CMC notes that WSDOE, which received bioassay results from the contaminated site in July of 1985, incurred response costs prior to both the September 1985 and December 1985 bar dates. Relying on this fact, CMC argues that the relevant party, the State of Washington, acting through WSDOE, incurred response costs prior to the September 10, 1985, bar date. According to this analysis, the State of Washington clearly had a claim which should have been filed before these bar dates. This analysis assumes, however, that the CERCLA claim brought against CMC belongs exclusively to the State of Washington and not its agencies. That is, this analysis assumes that an agency of the State of Washington cannot have a CERCLA claim apart from the state. *See* 42 U.S.C. §§ 9607(a)(4)(A), (B), 9601(21). WSDOT disagrees with this assumption. WSDOT argues that it is a responsible person apart from the state as an owner or operator, and therefore it has a cause of action apart from the State of Washington. *See* 42 U.S.C. §§ 9607(a)(1), 9601(20), (21). Relying on its argument that it has a cause of action apart from the State of Washington, WSDOT further argues that we should not attribute to WSDOT the response costs incurred by WSDOE, a separate state agency. This question of whether a state agency can have a CERCLA claim apart from the state is an important and difficult question. Nonetheless, it is one which we need not address today because even if we assume that WSDOT, not the State of Washington, is the relevant party, the facts indicate that

---

**5.** Moreover, such a rule would arguably conflict with our recent holding in *CMC Heartland Partners*. Although our discussion of the issue of when a CERCLA claim arises under Section 77 was brief, that opinion specifically mentions that the EPA knew about the hazardous site before the close of bankruptcy, yet that opinion does not mention whether response costs had been incurred with regard to this site. Such silence can be read two ways: a party need not incur response costs to have a claim or contingent CERCLA claim under Section 77, or because EPA does need not incur response costs before ordering cleanup under Section 106(a) of CERCLA, response costs could not be relevant when determining if EPA had a claim dischargeable in bankruptcy.

WSDOT had a claim or contingent claim before the entry of the November 25, 1985, consummation order.

WSDOT became aware of the contamination problem at the Brown and Haley site on August 13, 1985, when a WSDOE agent phoned David R. Thompson, a WSDOT engineer, and informed Thompson of such a problem. More specifically, the record indicates that WSDOE informed Thompson that there had been a spill of hazardous materials on WSDOT's property; this spill included copper and arsenic; the spill resulted from a train derailment; a bioassay test had been performed; and further exploration and testing would be necessary. Then, on August 16, 1985, WSDOE backed up this conversation with a letter. This letter, like the phone conversation, links the contamination problem to a train derailment. Furthermore, WSDOE informed WSDOT in this letter that the contaminant, which was identified as copper ore, was extremely hazardous. Because of its hazardous nature, WSDOE informed WSDOT that treatment, storage, and/or disposal of this material would be necessary.

With all this information in hand, WSDOT clearly knew by August 16, 1985, that there had been a release of a hazardous substance on its property and it knew some response costs due to testing, storage, treatment, and/or disposal were imminent. Moreover, there was enough information to indicate that this hazardous spill would fall within the purview of CERCLA. Finally, WSDOT purchased the property from Milwaukee Road; WSDOT knew the contaminant resulted from a train derailment; and this train derailment was a publicized event. With this information at its disposal, WSDOT should have been able to link the contamination problem to Milwaukee Road.

Not only did the information before WSDOT indicate that CERCLA response costs against Milwaukee Road were imminent, but WSDOT began sampling procedures around October 17, 1985. These samples were forwarded to a laboratory on October 21, 1985. WSDOT received some preliminary results on November 13, 1985, and the laboratory mailed the final results on November 26, 1985.

There has been much dispute among the parties regarding the point in which WSDOT incurred response costs. WSDOT would have us conclude that it did not incur response costs until November 26, 1985, when the final test results were sent from the laboratory—this is one day after the close of bankruptcy. And, according to WSDOT no cause of action accrued until this point. We do not agree with this assessment.

When a potential claimant knows that an identifiable responsible person, as defined by CERCLA, caused a release of a hazardous substance on the claimant's property so that response costs are imminent and when, in fact, the claimant takes some steps toward testing the contaminant, we see no reason to split hairs and hold that the claimant must first receive test results from a lab before it has a claim or contingent claim which must be brought to avoid discharge in a Section 77 proceeding. To the contrary, we conclude that whether response costs were incurred at the time of the sampling, the time in which the samples were sent to the laboratory, the time in which preliminary results were received, or when the final results were sent out, it is clear that WSDOT had sufficient information to give rise to a claim or contingent CERCLA claim for purposes of Section 77 before the November 25, 1985, consummation date. In fact, any other conclusion would frustrate the bankruptcy court's interest in having all claims before it, and any other conclusion would frustrate CERCLA's goal of providing a speedy cleanup of hazardous sites.[6]

We, like the district court, also find it significant that WSDOT failed to file a

---

**6.** WSDOT's opening brief did not discuss when its state claims for unjust enrichment and misrepresentation arose for purposes of Section 77. Nor did WSDOT mention this issue in its statement of issues. We take this silence as an acceptance of the district court's determination that these state claims constituted preconsummation claims that were barred by the consummation order.

motion under Rule 60(b) of the Federal Rules of Civil Procedure for relief from this consummation order within a reasonable time after the December 26, 1985, bar date. We further note that WSDOT likewise failed to make a motion for leave to file a late claim within a reasonable time after the bankruptcy. If WSDOT had filed such motions, WSDOT might be sitting in a different posture. However, considering that WSDOT waited four years after the close of bankruptcy to raise such claims, the district court did not abuse its discretion in concluding that the Milwaukee Road consummation order barred WSDOT's claims.

## B. *Notice*

■■■ The next question before us is whether WSDOT received adequate notice of the Milwaukee Road bankruptcy. WSDOT argues that it was entitled to actual notice of the bankruptcy proceedings. Section 77, however, does not require that all potential creditors receive actual notice. Rather, actual notice is necessary only as to known creditors, whereas constructive notice is sufficient for unknown creditors. *See In re Chicago Pac. Corp.*, 773 F.2d 909, 916–17 (7th Cir.1985). The question then becomes whether WSDOT was a known creditor deserving of actual notice.

First, we note that the Milwaukee Road bankruptcy trustee did provide the Washington Department of Revenue ("WSDOR") with actual notice of the applicable bar dates. The district court concluded that this notice to WSDOR constituted actual notice to WSDOT. We need not decide, however, if notice to one state agency constitutes adequate notice to another state agency because we affirm the district court's conclusion that WSDOT received adequate notice on other grounds.

The district court emphasized that WSDOT offered no support for its allegation that it constituted a known creditor. Because only known creditors deserve actual notice, the district court if not expressly, implicitly, concluded that the trustee was not required to provide WSDOT with actual notice of the bankruptcy bar dates. We

give wide deference to a district court's determination whether a claimant in bankruptcy constitutes a known creditor deserving of actual notice. *See id.* at 916.

WSDOT argues that if it had a claim which should have been raised before the close of bankruptcy, it must have been a known creditor. We do not agree, however, that the latter necessarily follows from the former. Admittedly it may not seem entirely fair to require a party who has no actual notice of a bankruptcy to raise a claim before the bankruptcy court or be forever barred from raising such claims. We must keep in mind, however, that the bankruptcy provisions constitute an attempt to balance various interests: the interest in the fair and equitable distribution of limited resources and the interest in giving a debtor a fresh start. These interests are better served if a bankruptcy court has all claims before it when distributing a debtor's property.

Although we conclude that WSDOT had sufficient information to give rise to a claim or contingent claim before the entry of the November 26, 1985, consummation order in the Milwaukee Road reorganization, the record does not indicate that Milwaukee Road had such information. That is, the record does not indicate that Milwaukee Road or its bankruptcy trustee had any idea that its earlier derailment led to contamination which would require cleanup. Nor does the record indicate that the Milwaukee Road or its bankruptcy trustee had any idea that WSDOE and WSDOT had begun testing procedures on this site before the close of bankruptcy. Nor does the record indicate that WSDOT took any steps to inform Milwaukee Road or the bankruptcy trustee of the situation. WSDOT argues, however, that because Milwaukee Road must have known about the train derailment, this means that WSDOT constituted a known creditor. Nonetheless, just as we were reluctant to hold that WSDOT had a claim at the time of a release or threatened release of a hazardous substance, we are likewise reluctant to hold that a party becomes a known creditor upon the mere release or threatened release of a hazardous substance.

Considering that the record contains no evidence that Milwaukee Road knew about the contamination problem, we cannot say that the district court abused its discretion in concluding that Milwaukee Road's knowledge of a pre-CERCLA train derailment, alone, was insufficient to make WSDOT a known creditor. As such, publication of the bankruptcy proceedings in *The Wall Street Journal* constituted sufficient notice.

### C. *Venue*

 WSDOT asked Judge Lindberg to transfer CMC's petition for an injunction to the Western District of Washington. Judge Lindberg denied this request. WSDOT appeals this denial.

We give great deference to a district court's rulings on motions to transfer venue. *Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir.1986). Indeed, this court can only reverse a district court's determinations in this regard if we find a "clear abuse of discretion." *Id.*

CMC brought its motion for injunctive relief to the United States District Court for the Northern District of Illinois, which served as the reorganization court in the Milwaukee Road bankruptcy. And, in this motion CMC asked the reorganization court to enforce its own consummation order. We have already indicated that the court which entered an order is in the best position to interpret that order. *See Chicago Rock Island*, 860 F.2d at 272. This means that the reorganization court was in a better position than the United States District Court for the Western District of Washington to interpret and apply the terms of this consummation order. Furthermore, the reorganization court, which was uniquely familiar with the history of the prior bankruptcy proceedings, was well equipped to deal with issues relating to these bankruptcy proceedings. Granted, the district court in Washington might have been better equipped to deal with an action for CERCLA response costs if such an action had not been barred by the bankruptcy proceedings. But, considering that the injunction made it unnecessary to address the underlying merits of the CERCLA claim, the reorganization court acted well within its broad discretion when it denied WSDOT's motion to transfer venue.

### CONCLUSION

For the above reasons, we AFFIRM.