In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-2420 & 14-2546

SAINT CATHERINE HOSPITAL OF INDIANA, LLC,

*Plaintiff-Appellant,*

*v.*

INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION,

*Defendant-Appellee.*

Appeals from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:13-cv-183 — **Sarah Evans Barker,** *Judge.*

ARGUED JANUARY 21, 2015 — DECIDED AUGUST 28, 2015

Before BAUER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* St. Catherine Hospital had to pay a Hospital Assessment Fee ("HAF") as part of an Indiana program designed to increase Medicaid reimbursements to eligible hospitals. St. Catherine was required to pay its HAF in two installments, but after it failed to pay its HAF, the Indiana Family and Social Services Administration ("FSSA") began withholding Medicaid reimbursements. On June 19, 2012, St. Catherine filed for bankruptcy under Chapter 11.

After this date, FSSA continued to withhold reimbursements in satisfaction of St. Catherine's HAF debt.

St. Catherine filed an adversary complaint against FSSA claiming that the HAF was a pre-petition claim subject to the automatic stay. The bankruptcy court granted St. Catherine summary judgment on this claim, ruling the HAF was an "act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case" pursuant to 11 U.S.C. § 362(a)(6) and was subject to the automatic stay. FSSA was ordered to repay St. Catherine the full amount it had withheld. FSSA appealed to the district court, which reversed the bankruptcy court's judgment as to the HAF for fiscal year 2013 (the "2013 HAF"). St. Catherine now appeals, arguing the 2013 HAF, like the 2012 HAF, is a pre-petition claim subject to the automatic stay. We agree and reverse the decision of the district court.

## I. BACKGROUND

St. Catherine is a regional health care facility in Charlestown, Indiana. The hospital is classified as a general acute care facility, which treats Medicare and Medicaid patients. Like other hospitals in the state, it receives reimbursement from the state and federal governments for its treatment of Medicaid patients. Specifically, the U.S. Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS") provides two dollars of funding for every one dollar provided by the state government.

On April 29, 2011, Indiana's General Assembly adopted Public Law 229–2011, Section 281 ("Section 281"), a measure designed to facilitate increased reimbursement for hospitals

providing care to Medicaid patients. The law provided that an assessment—known as the Hospital Assessment Fee ("HAF")—would be levied on eligible Indiana hospitals to create a fund from which the state would reimburse those hospitals for their treatment of Medicaid patients. Under the law, all eligible hospitals were to be assessed during the "fee period" running from between July 1, 2011 to June 30, 2013. This fee was calculated one time, but hospitals were required to pay their fee in two installments—one for fiscal year 2012 and the other for fiscal year 2013. The amount each individual hospital was to contribute to the fund was determined based upon the hospital's cost reports from May 1, 2010 to April 30, 2011, and other financial information on file as of February 28, 2012.

Collection of the HAF could not commence until the program received approval from the federal government. CMS issued its approval of Section 281 on May 21, 2012. The next day, FSSA issued Provider Bulletin BT201217 to all Indiana hospitals informing them of the timeline that would govern the HAF assessments and the agency's collection methods.[1] Thereafter, FSSA began assessing the HAF on hospitals, retroactively dated to July 1, 2011.

St. Catherine was subject to a HAF. Based on the hospital's cost reports, the FSSA determined that it owed $1,107,038.51 for fiscal year 2012 and roughly the same amount for fiscal year 2013. On May 29, 2012, FSSA sent St. Catherine the bill for fiscal year 2012. FSSA then began withholding Medicaid reimbursements from St. Catherine to

---

[1] This bulletin is available at http://provider.indianamedicaid.com/ihcp/Bulletins/BT201217.pdf (last visited July 17, 2015).

recover the approximately $1.1 million that St. Catherine owed retroactive to July 1, 2011.

On June 19, 2012, St. Catherine filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. After this date, FSSA continued its withholdings in service of St. Catherine's fiscal year 2012 HAF debt for two more weeks. On July 28, 2012, FSSA issued St. Catherine a bill for fiscal year 2013, totaling $1,127,296.44. Again, the hospital did not pay. As a result, after July 1, 2013, FSSA began withholding Medicaid reimbursements in satisfaction of this debt as well. All told, FSSA withheld $989,738.78 in satisfaction of the fiscal year 2013 HAF. These withholdings were made after St. Catherine had filed its bankruptcy petition.

On March 14, 2013, St. Catherine filed an adversary complaint against FSSA seeking an injunction against further collection of the HAF and recovery of sums withheld by FSSA both before and after its Chapter 11 filing. The bankruptcy court granted St. Catherine's motion for a preliminary injunction and issued an order enforcing the automatic post-petition stay. St. Catherine then moved for summary judgment, seeking recovery of the $615,912.64 withheld by FSSA before its bankruptcy petition in service of the fiscal year 2012 HAF and the $989,738.78 withheld post-petition in service of the fiscal year 2013 HAF. The bankruptcy court ultimately granted St. Catherine summary judgment on all of its claims, ruling that the pre-petition withholdings constituted preference payments under 11 U.S.C. § 547 and were not subject to the exemption for payments made in the ordinary course of business. As to the post-petition withholdings, the court concluded that both the 2012 and 2013 HAFs constituted "act[s] to collect, assess, or recover a claim against the

debtor that arose before the commencement of the case" pursuant to 11 U.S.C. § 362(a)(6), and were thus subject to the automatic stay. FSSA was ordered to repay St. Catherine the full amount it had withheld. FSSA appealed to the district court, which affirmed as to other causes of action, but reversed the bankruptcy court's judgment as to the fee imposed for fiscal year 2013, deeming it a post-petition claim. This appeal followed.

## II. ANALYSIS

### A. The Automatic Stay and the Conduct Test

The "automatic stay" is a statutory injunction against efforts outside of bankruptcy to collect debts from a debtor who is under the protection of the bankruptcy court. 11 U.S.C. § 362. It bars any "act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." *Id*. at § 362(a)(6). At issue in this appeal is whether the 2013 HAF constitutes a "claim" against St. Catherine that arose prior to the commencement of its bankruptcy, and is therefore subject to the automatic stay.[2] We review the district court's finding on this question *de novo*. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011).

There is no dispute that the 2013 HAF is a "claim." The Bankruptcy Code (the "Code") defines a "claim" as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). What we must

_____

[2] It is undisputed that the 2012 HAF (for the period July 1, 2011 through June 30, 2012) is a pre-petition claim.

determine then is the date on which the 2013 HAF arose for purposes of classifying it as a pre- or post-petition claim. To make this determination, virtually all courts now apply some version of the "conduct test." Under this approach, the date of a claim is determined by the date of the conduct giving rise to the claim. *See Watson v. Parker (In re Parker)*, 313 F.3d 1267, 1269 (10th Cir. 2002) (ruling malpractice claim arose on date malpractice allegedly occurred); *Grady v. A.H. Robins Co.*, 839 F.2d 198, 203 (4th Cir. 1988) (ruling tort claim arose on date tortious conduct allegedly occurred). By contrast, under the outmoded "accrual theory," the date of a claim was determined pursuant to the state law under which liability for the claim arose. *See In re Grossman's Inc.*, 607 F.3d 114, 119–121 (3d Cir. 2010) (overruling accrual test under which "the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose as determined by reference to the relevant non-bankruptcy law") (citations omitted).

Because the conduct test includes both contingent and unmatured claims, it is thought to be in accordance with the broad definitions of "debt" and "claim" in the Code. *See Parker*, 313 F.3d at 1269 (adopting conduct test over accrual test as "the one more in tune with the plain language and the policy underlying the Bankruptcy Code"); *Grady*, 839 F.2d at 202 ("[T]he legislative history shows that Congress intended that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in bankruptcy."); *see also* 11 U.S.C. § 101(12) (defining "debt" as "liability on a claim"); *id.* at § 101(5)(A). Some courts, however, expressing concern that the conduct test may be overly broad, require a "prepetition relationship" between the parties, "such as contact, exposure, impact, or privity, between the debtor's prep-

etition conduct and the claimant." *In re Piper Aircraft Corp.*, 162 B.R. 619, 627 (Bankr. S.D. Fla. 1994) *aff'd*, 168 B.R. 434 (S.D. Fla. 1994), *aff'd as modified sub nom. Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573 (11th Cir. 1995). This pre-petition relationship requirement "ameliorates the problem often attributed to the conduct test—that a bankruptcy proceeding cannot identify and afford due process to claimants" with unmatured or contingent claims. *In re Grossman's*, 607 F.3d at 123 (citing Barbara J. Houser, *Chapter 11 as a Mass Tort Solution*, 31 LOY. L.A. L.REV. 451, 465 (1998). While we have never explicitly endorsed any approach, bankruptcy courts in this jurisdiction commonly apply the conduct test, *see e.g.*, *In re Papi*, 427 B.R. 457, 465–66 (Bankr. N.D. Ill. 2010); *In re Bonnett,* 158 B.R. 125, 127 (Bankr. C.D. Ill. 1993), and we adopt it today. We decline to decide whether a pre-petition relationship is always required, but note that the parties here had one.

### B. 2013 HAF Subject to Automatic Stay

With this in mind, we turn to the claim at issue in this appeal. The parties agree that the conduct test should apply; however, they quarrel over what conduct gave rise to the 2013 HAF. St. Catherine characterizes the relevant conduct as Indiana's enactment of Section 281, CMS's approval of that law, and the meeting of the state's hospital assessment fee committee for purpose of calculating the HAF. All of this conduct occurred before the hospital's petition for bankruptcy was filed on June 19, 2012. St. Catherine also emphasizes that the calculation of its HAF (for both 2012 and 2013) was based entirely on cost reports produced on or before February 28, 2012, well before the bankruptcy filing.

FSSA characterizes the conduct giving rise to the 2013 HAF as St. Catherine's continued operations as an eligible hospital under Section 281 until July 1, 2012. It argues that pursuant to Provider Bulletin BT201217, any hospital that ceased its operations or failed to qualify as an "eligible hospital" prior to July 1, 2012 (the first day of the 2013 HAF assessment period) would not be liable for the 2013 HAF.[3] Based on this, FSSA concludes that its claim for the 2013 HAF arose on July 1, 2012.

The determination of what conduct gives rise to a claim will vary depending on the nature of the liability, be it tort, contract, or tax. *See Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 974 F.2d 775, 781 (7th Cir. 1992). The difficulty here is that the HAF does not fit neatly into any of these categories. St. Catherine submits that Section 281 "is the functional equivalent of a two-year contract between the FSSA and the Debtor." Since contractual liability is generally thought to arise on the date a contract is signed, *see In re Rosteck*, 899 F.2d 694, 696 (7th Cir. 1990) (post-petition assessments were to be treated as pre-petition debts where they emanated from pre-petition contract between debtor and condominium association), St. Catherine concludes that the HAF liability arose on the date Section 281 was passed (or, at the latest, approved by CMS). Of course, the contract

---

[3] Provider Bulletin BT201217 explains that only those hospitals licensed under Indiana Code § 16-21-2 are eligible to pay the HAF fee and advises that any hospital that loses its eligibility must notify the state agency within 30 days. Based on this, the district court found that although the Bulletin does not say so explicitly, if St. Catherine had ceased to be an eligible acute care hospital before July 1, 2012, it would not have been subject to the 2013 HAF.

analogy fails for various reasons, the most obvious being that St. Catherine played no role whatsoever in the legislative process that gave rise to Section 281.

By contrast, FSSA argues that Section 281 was "akin to a tax" levied annually on eligible hospitals. It furthers this analogy by pointing out that FSSA issued hospitals separate bills for fiscal years 2012 and 2013. But this analogy is also flawed. As FSSA concedes, the HAF is not, in fact, a tax. And it operated very differently from one. The HAF was not calculated on an annual basis, as are taxes typically. Nor was the HAF a fundraising device for the state. Rather, it was a fee imposed on hospitals for the purpose of increasing Medicaid reimbursements for those same hospitals.

Admittedly, the claim at issue here is one that does not "lend[] itself to governance by formula." *Fogel v. Zell*, 221 F.3d 955, 962 (7th Cir. 2000). But we are not persuaded by FSSA's argument that Section 281 gave rise to two separate liabilities, one for fiscal year 2012 and the other for fiscal year 2013. The statute made clear that there was one HAF for one "fee period," and that the entire HAF was set prepetition. Nor is it of particular significance that FSSA sought to collect this fee in two installments and issued two separate bills. Home loans, for example, are assessed over time, but that does not mean that a home loan is many individual debts.

Here, the 2013 HAF was assessed based upon the activities reflected in St. Catherine's cost reports from May 1, 2010 to April 30, 2011, and other financial information on file as of February 28, 2012. These activities—along with the passage of Section 281 and CMS's approval of that law—all occurred before St. Catherine filed for bankruptcy. Since all of the

conduct that could have given rise to the 2013 HAF occurred pre-petition, we find that the claim is subject to the automatic stay.

That St. Catherine's continued operation as an eligible hospital on July 1, 2012 may have been required in order for the 2013 HAF to be assessed does not change our analysis. This fact would simply make the claim "contingent" upon the hospital's continued eligibility on July 1, 2012. A "contingent" claim is one conditioned upon some future event that is uncertain. *See In re Rosteck*, 899 F.2d at 697 (quoting *Grady*, 839 F.2d at 200) (defining contingent as "[p]ossible but not assured; doubtful or uncertain; conditioned upon some future event which is itself uncertain or questionable …. impl[ying] that no present interest exists, and that whether such interest or right will ever exist depends upon a future uncertain event"). And as noted above, the Code's definition of "claim" explicitly includes any "right to payment, whether or not such right is … contingent" upon some future event, which may or may not happen after the filing of a bankruptcy petition. *See* 11 U.S.C. § 101(5)(A). Thus, assuming FSSA's reading of Provider Bulletin BT201217 is accurate, it would simply mean that had St. Catherine ceased to be an eligible hospital prior to the beginning of the fiscal year 2013, a contingency for its 2013 HAF liability would not have been met. It would not mean that the underlying claim did not already exist.

To conclude, we note that under most circumstances, finding that a claim arose "at the earliest point possible" will best serve the policy goals underlying the bankruptcy process. *See Matter of Chicago*, 974 F.2d at 782. This is because doing so enables the bankruptcy court to bring before it as

many claims against the debtor as possible, and from there to "equitably distribute property [among the creditors] and assure the debtor a fresh start." *Id*. (explaining there is "little benefit" to be "gained by allowing a person who knows it has a claim to pursue the claim outside of bankruptcy or to sit on the claim until after bankruptcy"). To be sure, there are exceptions to this rule—mostly notably, where the claimant is the victim of pre-petition tortious conduct, but does not realize he or she has been a victim until some harm manifests after the bankruptcy. In these situations, a court may be less inclined to conclude that the party had a claim or contingent claim dischargeable in bankruptcy (i.e., subject to the automatic stay), because to do so would forever bar that party from raising the claim against the individual debtor, reorganized company, or its successors. *Id*. (citing *Schweitzer v. Consol. Rail Corp.,* 758 F.2d 936, 940–44 (3d Cir. 1985), *cert. denied,* 474 U.S. 864 (1985)). But this exception does not apply here, as FSSA was aware of its claims against St. Catherine—for both fiscal years 2012 and 2013—well before it filed for bankruptcy.

### III. CONCLUSION

The judgment of the district court is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.