TERENCE T. EVANS, Circuit Judge.
 

 Like the Energizer Bunny, litigation growing out of the Milwaukee Road’s bankruptcy proceedings keeps going and going and going. Today, we issue another opinion — to be added to more than a dozen others — in a case stemming from the reorganization of the railroad which began in 1977.
 

 The Chicago, Milwaukee, St. Paul & Pacific Railroad Company, better known as the Milwaukee Road, came to the end of the line in 1977 when it petitioned for reorganization pursuant to § 77 of the Bankruptcy Act of 1898, formerly 11 U.S.C. § 205 (1976) (repealed 1978). The United States District Court for the Northern District of Illinois served as the reorganization court.
 

 In accordance with procedures under the Bankruptcy Act, the reorganization court established deadlines, or bar dates, for the filing of claims against Milwaukee Road, the estate, and its trustee. The first bar date was September 10, 1985, which established the deadline for all post-petition claims (claims arising against Milwaukee Road during the period of reorganization). Notice of this bar date was sent to all known creditors and published in
 
 The Wall Street Journal.
 

 On November 12, 1985, the reorganization court entered a consummation order. This order became effective on November 25, 1985, the consummation date. The consummation order set forth a new bar date of December 26, 1985, for claims that arose between the prior September 10 bar date and the November 25 consummation date. This order bars and forever discharges all untimely claims against the trustee, the Milwaukee Road, and its successors and assigns.
 

 The question we face, for the second time, is whether certain claims of the Union Pacific Railroad are among those properly barred by the reorganization court. The claims arise out of an environmental cleanup of a railyard located within the Commencement Bay/Near-shore Tideflats Superfund site in Tacoma, Washington. Union Pacific purchased the land from the Milwaukee Road in 1980 and, as the owner of the land (at least the owner at the time the appeal was filed but more about that later), faces liability for the cleanup. It filed claims for the cleanup against CMC Heartland Partners, successor-in-interest to the Milwaukee Road, under both the Comprehensive Environmental Response,
 
 *287
 
 Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601
 
 et seq.,
 
 and the Model Toxics Control Act of the State of Washington, Wash.Rev.Code Ch. 70.105D.010
 
 et seq.
 

 We first encountered the question in 1993. A brief review of our decision in
 
 In re Chicago, Milwaukee, St. Paul & Pacific R.R.,
 
 3 F.3d 200 (7th Cir.1993), will set the stage for our analysis of the present appeal.
 

 We noted that the situation required us to attempt to reconcile conflicting goals of laws that deal with environmental cleanups and those of the bankruptcy code designed to give debtors a “fresh start.” In that context we determined that claims subject to the claims bar included “contingent claims.” In the context of CERCLA, a contingent claim exists, we said, when a party potentially liable for response costs under the Act can tie a debtor to a “known release of a hazardous substance.” At 202. Under that formulation we determined that Union Pacific’s CERC-LA claim was barred.
 

 However, the Washington state Model Act became effective in 1989, four years after the bar date. We joined other courts, e.g., the Court of Appeals for the Third
 
 Circuit
 
 —In
 
 re Penn Central Transp. Co.,
 
 944 F.2d 164 (1991),
 
 cert. den.
 
 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992)—in concluding that claims based on a statute enacted after the discharge date are not barred.
 

 That was not the end of the issue. CMC argued that two Washington statutes, the Water Pollution Control Act, Wash.Rev.Code Ch. 90.48, and the Hazardous Waste Management Act, Wash.Rev.Code Ch. 70.105, which existed prior to the bar date, provided the same or similar relief as the Model Act and thus barred the claim. We remanded the case to the reorganization court for a determination “as to what liabilities under the Model Act existed in 1985 by virtue of Washington state statutes then in effect.”
 

 On remand, the district court did an admirably thorough job. Judge George W. Lind-berg referred the issue to Magistrate Judge W. Thomas Rosemond, Jr., who compared the Model Act to those two statutes and a third, which CMC added to the mix after remand, the Washington nuisances statute, Wash.Rev.Code Ch. 7.48.140. Judge Rose-mond issued a recommendation that the claim not be barred. Judge Lindberg considered objections to the recommendation and, with minor modifications, also concluded that the claim was not barred — that Union Pacific was not subject to the same liability for cleanup of the railyard under prior Washington statutes as it was under the Model Act and, therefore, its claim for contribution from CMC did not exist prior to the enactment of the Model Act. CMC appeals that decision as well as a later decision on its Rule 60 motion in the district court based on newly discovered evidence.
 

 In addition, because Union Pacific sold the land to the Port of Tacoma during the pen-dency of the appeal, Union Pacific seeks to substitute the Port as the party prosecuting this case. We decline to substitute parties. This appeal will proceed with the original cast. Given the outcome of this appeal and the agreement between Union Pacific and the Port, we find that there is no reason to order substitution.
 

 As to the appeal itself, our standard of review in the many Milwaukee Road cases was set out some time ago:
 

 Because the district court’s entry of an injunction in this case was both a bankruptcy decision and an interpretation of its prior consummation order, we review the court’s decision to bar [the creditor’s] claims for abuse of discretion. Nonetheless, in applying the abuse of discretion standard, we do not give equal deference to every aspect of a court’s decision. The abuse of discretion standard is used to evaluate the reorganization court’s application of the facts to the appropriate legal standard, and the factual findings and legal conclusions underlying such decisions are evaluated under the clearly erroneous and de novo standards, respectively.
 

 In re Chicago, Milwaukee, St. Paul & Pacific R.R.,
 
 974 F.2d 775, 779-80 (7th Cir., 1992). The decision on the Rule 60 motion is subject to considerably more deference. It is reviewed for an abuse of discretion.
 

 The railyard in Tacoma was owned and used by the Milwaukee Road from the early years of this century. In 1980, Union Pacific,
 
 *288
 
 with the authorization of the reorganization court, purchased the Tacoma site from the trustee and later assigned it to a wholly owned subsidiary, the Oregon-Washington Railroad and Navigation Co. The purchase agreement contained an indemnification clause for claims arising out of the operation of the property prior to March 12, 1980.
 

 After purchasing the site, Union Pacific removed existing structures and let the land stand vacant. In 1980, Union Pacific’s own inspection of the property revealed that the area of the site used for diesel fueling was saturated with oil which, along with contaminated dirt, would probably have to be removed.
 

 The railyard is in a highly industrial area. In October 1981, the United States Environmental Protection Agency placed the area on the Agency’s National Priority List. The Superfund site was described as one of the ten most hazardous sites in the country. In 1982 the State of Washington commissioned an environmental study of the railyard, and the EPA investigated the site in 1985.
 

 Union Pacific also owned other property within the Superfund site and had dealings with the EPA in connection with two of them. One was an abandoned railway tunnel. The EPA notified Union Pacific in 1982 that it was a potentially responsible party for the cleanup of that site. Later, however, the EPA determined that the tunnel was not the source of contamination and discontinued its investigation.
 

 The other site was Union Pacific’s Tacoma fueling facility. The Department of Ecology of the State of Washington investigated oil contamination in the City of Tacoma waterway in 1982 and, under Washington’s Water Pollution Control Act, directed Union Pacific to take remedial action. Union Pacific commissioned a groundwater investigation. Although the investigation revealed no groundwater contamination, Union Pacific, with state approval, removed the top foot of soil at the facility.
 

 Then in 1990, Union Pacific decided to sell the railyard and, in preparation for the sale, commissioned an environmental audit. The audit, completed in June 1990 by a company called Applied Geotechnology, found subsurface contamination of the sod by petroleum hydrocarbons. The audit also identified potential contamination from metals and solvents. As required by law, Union Pacific notified both the EPA and the State of Washington of these findings.
 

 The State notified Union Pacific that it was potentially hable for cleanup of the site under the Model Act. The EPA notified the company that it was also a potentially responsible party under CERCLA. Union Pacific and the State entered into an agreement for remediation of contamination at the railyard.
 

 It was then, on September 9, 1991, that Union Pacific served CMC with a demand for settlement negotiations regarding the cleanup. CMC filed a motion in the reorganization court to enjoin Union Pacific, under the consummation order, from asserting any claims arising out of the cleanup of the rail-yard. Union Pacific filed a complaint in the Western District of Washington for contribution under CERCLA and the Model Act.
 

 This summary brings us to the issue at hand. Should the claim under the Washington Model Act be barred? We have previously noted that Union Pacific’s CERCLA claim is barred. In fact, in 1996, as we look back at the situation, it seems surprising, if not shocking, that Union Pacific did not file a contingent CERCLA claim. Also from our 1996 vantage point, it is perhaps less surprising, but nevertheless worthy of notice, that Union Pacific did not file a contingent claim under any possibly relevant existing state statute.
 

 But questions regarding whether the existence of claims under prior statutes bars a claim now under the Model Act can only be fairly answered by viewing the world from a 1985 perspective, not from our perspective in 1996. We must resist the temptation to use 20-20 hindsight.
 

 What was the 1985 perspective? It can best be understood by a brief glance at the history of CERCLA, which is, after all, the inspiration for Washington’s Model Toxics Control Act. CERCLA is the source of our current understanding that owners
 
 as owners
 
 can be responsible for cleanup costs.
 

 
 *289
 
 CERCLA became effective on December 11,1980, ten months after Union Pacific purchased the railyard. Tremendous changes in environmental law have occurred in the 15 years since the passage of the Act. One commentator has said that with one possible exception, CERCLA “stands alone as a conspicuous example of legislative consequence outdistancing even the boldest imagination of its sponsors.”
 
 [1]
 
 He points out that looking back in 1985, Congress could believe that CERCLA was aimed at a relatively limited problem and that cleanup was a relatively inexpensive affair involving scraping off some soil.
 
 [2]
 

 And, in fact, CERCLA was a sleeper at first. It was widely thought to be a short-range law; it had a self-destruct provision of September 30, 1985. Prior to reauthorization in 1986, it had accomplished long-term total cleanup of only 14 sites.
 
 [3]
 
 Furthermore, the political climate was not conducive to bold environmental initiatives. The EPA administrator appointed in 1981 was reluctant to use the full authority provided by the Act. She and other top administrators wanted to limit the program to five years, and they minimized the extent of hazardous waste problems.
 
 [4]
 

 With the full power of CERCLA not yet fully understood or acknowledged, it was unlikely that states would assume that their existing, traditional environmental statutes could provide the kind of relief that CERC-LA would eventually be seen to provide. In fact, states were unsure of what their powers were. On March 10,1986, four months after the bar date in this case, the Supreme Court struck down a New Jersey state cleanup tax law on the grounds that CERCLA preempted that particular type of state action.
 
 Exxon Corp. v. Hunt,
 
 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986). In 1986, Congress repealed the section on which the Court relied, and it is now, as we stated in our prior decision in this case, quite clear that CERCLA does not preempt state action.
 
 See also Burlington Northern R.R. v. Time Oil Co.,
 
 738 F.Supp. 1339 (W.D.Wash.1990).
 

 The expansion of the influence of CERCLA came primarily as a result of the 1986 reauthorization bill, the Superfund Amendments and Reauthorization Act of 1986 (SARA). A look at a few things SARA added to the law will show what was missing in the original bill. SARA expanded the types of costs which could be recovered from responsible parties. These now include virtually every conceivable expense, including health assessments and health effects studies, and interest from the date that payment is demanded. See § 9607(a)(4)(D). It provided specifically for actions for contribution. See § 9613(f). It dealt with the unanswered question as to how clean is clean. It provided for explicit cleanup standards, stating that remedial actions which permanently reduce toxics are to be preferred over remedial actions which do not involve permanent reduction. See § 9621(b). Significantly for the present case, SARA also gave the states the right to substantial and meaningful involvement in cleanup efforts. § 9621(f).
 

 Early case law also shows the way courts were feeling their way toward the strong CERCLA that now exists. In 1983, courts were struggling with the causation issue. In
 
 United States v. Wade,
 
 577 F.Supp. 1326 (E.D.Pa.1983), the court considered whether the Act required traditional proof that a defendant caused the harm. Only after much discussion did the court determine that the Act imposed liability on certain persons, without proof that their specific waste caused the necessity for a cleanup. As late as 1985, in
 
 State of New York v. Shore Realty Corp.,
 
 759 F.2d 1032 (2d Cir.1985), the court was still considering arguments that CERCLA applied only to the entity which was the owner of the property at the time of the discharge and that there must be a showing of causation. The court ultimately rejected both contentions, holding that CERCLA “unequivocally imposes strict liability on the current owner of a facility from which there is a
 
 *290
 
 release or threat of release, without regard to causation.” At 1044. The court stated a proposition used as a starting point today, but it was not always so.
 

 Given this historical context in 1985, did Union Pacific have a contingent claim, based on the three existing Washington statutes, which would bar its claim based on Washington’s 1989 Model Act? Today, CMC asks us to interpret the statutes creatively to say that Union Pacific would have known in 1985 that it, as owner, might have been held responsible for allowing seepage, identifiable as from the railyard, that anyone would know must have gotten into the ground water and that therefore it could be ordered to remediate the site permanently. Was such an interpretation of the Washington statutes within the realm of possibility in 1985, or would Union Pacific have been considered almost frivolous for filing with the bankruptcy court a claim for contribution based on such potential liability? For that matter, is such an interpretation possible today?
 

 We have reviewed de novo the conclusions of the district court regarding these issues and conclude that the court was correct. The Washington statutes did not provide the comprehensive liability or remedy found in the Model Act.
 

 The Washington Model Act was the result of a statewide initiative. The bill, which became effective on March 1, 1989, as we said, is modeled after CERCLA/SARA but in some ways seems even clearer. For instance, CERCLA lists covered persons as the “owner and operator” of a hazardous waste site. That phrase prompted litigation in which arguments were made regarding whether to be a covered person one had to be both an owner and an operator or whether “and” actually meant “or” in that context.
 
 See, e.g., United States v. Maryland Bank & Trust Co.,
 
 632 F.Supp. 573 (D.Md.1986). The Model Act stated clearly that covered persons included the “owner or operator.” § 70.105D.040(1)(a). With narrow exceptions, the Model Act imposes strict liability on an owner of property based merely on ownership without regard to what actions the owner took on the property to cause pollution. The owner of the site is a person potentially responsible for the cleanup, whether or not it caused the pollution. The Act also recognizes the difficulty of identifying with precision the parties responsible for hazardous waste sites, and thus it permits joint and several liability. § 70.105D.010(4).
 

 The Washington statutes existing in 1985, which we will soon discuss, often impose liability — sometimes strict liability — on the owner of a property. However, strict liability attaches based on an owner’s activities at the site. The statutes are grounded in a traditional version of strict liability; that is, strict liability as a theory of recovery based on the idea that a defendant
 
 engaged in some kind of activity
 
 which exposed others to a risk of harm and that the activity justified allocating the risk to the defendant, even though he acted with reasonable care — that is, it is not necessary to prove negligence.
 
 See
 
 Prosser & Keeton,
 
 The Law of Torts
 
 653 (1984).
 

 Liability under the existing statutes would require difficult matters of proof. Union Pacific took some actions at the site — removing structures, etc. Looking back, CMC urges us to say that the Department of Ecology could have attempted to prove that Union Pacific’s actions — taken arguably to clean up the site — actually disrupted the land and caused pollution. Being realistic, we have to recognize how highly unlikely that is. Furthermore, the proof of harm would involve showing that the petroleum hydrocarbons from the railyard did, in fact, seep into the waters of the state. It is easy to look back and say, ‘Well, of course, they must have,” but such speculation does not proof make. A remote possibility of liability under the existing statutes should not bar a claim under the Model Act.
 

 In addition, enforcement provisions of the Model Act are like those in CERCLA not those that traditionally existed. The Model Act has as its purpose the protection of each person’s “fundamental and inalienable right to a healthful environment....” § 70.105D.010(1). To ensure that cleanup is accomplished, it, like CERCLA, has strong enforcement provisions. After determining that “remedial action is in the public interest” the state can “issue orders requiring
 
 *291
 
 potentially liable persons to provide the remedial action.” Refusal to conduct the cleanup can result in draconian penalties. A person who claims to have been improperly required to take remedial action must take the action first and contest the order with the department or in court later. See § 70.105D.050. The Model Act is, like CERCLA, a statute under which — as we pointed out in another Milwaukee Road case — persons needlessly told to clean up may recover costs only after they have done so: “In the meantime they must get the lead out” — or the petroleum hydrocarbons.
 
 In re CMC Heartland Partners,
 
 966 F.2d 1143, 1148 (7th Cir.1992).
 

 Having made our generalizations, we turn to a discussion of the individual Washington statutes.
 

 The Water Pollution Control Act, Wash. Rev.Code § 90.48.080, provides:
 

 Discharge of polluting matter in waters prohibited. It shall be unlawful for any person to throw, drain, run, or otherwise discharge into any of the waters of this state, or to cause, permit or suffer to be thrown, run, drained, allowed to seep or otherwise discharged into such waters any organic or inorganic matter that shall eause or tend to cause pollution of such waters according to the determination of the commission, as provided for in this chapter.
 

 CMC argued in the district court, as it does here, that the Water Pollution Control Act (WPCA) is a strict liability statute which could apply in this case because the pollutants on the railyard likely “seep” into the waters of the state. The district court properly rejected the notion that this statute provided a contingent claim which would bar a claim based on the Model Act.
 

 CMC seeks comfort in a 1992 decision of the Washington Pollution Control Hearings Board which held that the WPCA imposes strict liability and, in fact, that liability may be imposed on the landowner.
 
 Nordevan v. State of Washington, Dep’t of Ecology,
 
 1992 WL 172977 (1992). Unfortunately for CMC, a look at the facts in
 
 Nordevan
 
 shows how different that situation is from that at the railyard.
 

 Nordevan is a company which buys, clears, and prepares land for sale to developers. The land in question was on a steep slope with a creek running through it. Nordevan obtained various permits and began clearing the land. And, of course, as the board specifically found, it rains a lot in Washington. There were clear, obvious, and serious erosion problems which muddied the creek. The sophistication required to establish this violation is far less than would be necessary to establish the pollution of groundwater from the Union Pacific site. In imposing liability on Nordevan, the board stated that the Water Pollution Control Act was a strict liability statute. Nordevan had “drained, suffered or caused the discharges into the waters of the state” and was therefore strictly liable.
 

 Further, Nordevan had allowed a utility company a limited utility easement. In what CMC argues is an imposition of liability on an owner
 
 as owner,
 
 the board said that Nor-devan, as the owner of the property, “remained responsible for the discharge of potential pollution.” We disagree with CMC’s interpretation.
 

 The manner in which liability attached to the owner in
 
 Nordevan
 
 is similar to the liability on the owner in
 
 Sea Farms, Inc. v. Foster & Marshall Realty, Inc.,
 
 42 Wash.App. 308, 711 P.2d 1049 (1985). There the court considered oyster beds “negligently damaged by the construction of a marina.... ” Sea Farms sued both the developer and the project engineer of the marina. The owner of the land attempted to pass off its liability onto the general contractor. That it was not permitted to do. The duty to comply with the permit which had been issued to the owner to build the marina was nondele-gable. The owner’s motion for summary judgment was denied because it had a duty not to pollute its own waters, as well as those of others: “Thus the duty to refrain from acts which will pollute waters on another’s land may not be delegated to an independent contractor.” At 312, 711 P.2d 1049.
 

 In both
 
 Sea Farms
 
 and
 
 Nordevan,
 
 the owner is responsible for pollution done on its land by those acting with its knowledge and
 
 *292
 
 permission. It is a far cry from Union Pacific being held liable for pollution caused by the Milwaukee Road during a half century before Union Pacific bought the land.
 

 In addition, although the WPCA prohibits permitting any polluting matter to seep into the waters, and although it would perhaps be possible to show that the pollutants from the railyard have seeped into the groundwater, the proof required to sustain that claim as to the railyard could be formidable. The statute would seem to require that one prove that the pollutants which exist in the groundwater — or any other water — came from the railyard. The railyard is located in an area of bountiful sources of pollutants. The proof on this point would be considerably more than what is required under the Model Act.
 

 Finally, after defying the orders of the Department of Ecology to control the erosion, Nordevan was fined $15,000, with $5,000 of that amount suspended on the condition that it not violate the law for two years. In short, Union Pacific did not face the same threat of liability and thus did not possess the same claim for contribution under the WPCA as it did once the Model Act went into effect.
 

 The Washington Hazardous Waste Management Act, Wash.Rev.Code § 70.105.050, is even less helpful to CMC. It provides that:
 

 No person shall dispose of designated extremely hazardous wastes at any disposal site in the state other than the disposal site established and approved for such purpose under provisions of this chapter, except when such wastes are going to a processing facility which will result in the waste being reclaimed, treated, detoxified, neutralized, or otherwise processed to remove its harmful properties or characteristics.
 

 “Dispose or disposal” is defined as “the discarding or abandoning of hazardous wastes or the treatment, decontamination, or recycling of such wastes once they have been discarded or abandoned.” § 70.105.010(4). It is not necessary to say much more about a potential Union Pacific claim under this statute than that the district court was right to reject the argument that one might have existed.
 

 The statute refers clearly to those who dispose of waste at disposal sites, not to those who own land on which wastes were allowed to gather by a previous owner. Union Pacific would not have had occasion to be concerned about a potential claim under this statute. CMC does not provide us with any cases in which liability has been established in similar circumstances.
 

 Finally, we turn to Washington’s nuisance statute. The statute is not a model of efficiency. Several sections of the Act could conceivably be argued to be applicable to this ease. Section 7.48.010 defines actionable nuisances:
 

 The obstruction of any highway or the closing of the channel of any stream used for boating or rafting logs, lumber or timber, or whatever is injurious to health or indecent or offensive to the senses, or an obstruction in the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property, is a nuisance and the subject of an action for damages and other and further relief.
 

 Section 7.48.120 defines nuisance:
 

 Nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others, offends decency, or unlawfully interferes with, obstructs or tends to obstruct, or render dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or any public park, square, street or highway; or in any way renders other persons insecure in life, or in the use of property.
 

 Then § 7.48.130 defines public nuisance:
 

 A public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal.
 

 Section 7.48.150 says everything in 7.48.130 is a private nuisance. If all that was not enough, § 7.48.140 enumerates public nuisances. Subsection (2) is the one argued to be relevant:
 

 To throw or deposit any offal or other offensive matter, or the carcass of any
 
 *293
 
 dead animal, in any watercourse, stream, lake, pond, spring, well, or common sewer, street, or public highway, or in any manner to corrupt or render unwholesome or impure the water of any such spring, stream, pond, lake, or well, to the injury or prejudice of others[.]
 

 The statute provides for abatement of the nuisance. See § 7.48.250.
 

 What seems clear from a simple reading of the statutes is that parlaying a claim based on those statutes into something approaching that arising from the Model Act would be more than an uphill battle.
 

 In 1985, the Supreme Court of Washington discussed a private nuisance action on certification from the District Court for the Western District of Washington. The discussion sheds light on the nature of a nuisance action. A nuisance action required a “substantial and unreasonable interference with [the] use and enjoyment of’ one’s property.
 
 Bradley v. American Smelting and Refining Co.,
 
 104 Wash.2d 677, 709 P.2d 782 (1985). We could not say with confidence that Washington courts would interpret that requirement sufficiently broadly to allow a claim regarding the railyard. It is, as we have noted, located in a highly industrial area, identified as a Superfund site. The railyard could hardly affect the rights of the “neighborhood.” See § 7.48.130. Union Pacific could as easily have a claim against other property owners within the site. And while the entire site could be alleged to affect the rights of the “entire community”
 
 (id.),
 
 it would be hard to single out Union Pacific and would be a formidable challenge to sue all of the property owners within the site.
 

 CMC calls our attention to
 
 Miotke v. City of Spokane,
 
 101 Wash.2d 307, 678 P.2d 803 (1984), which involved a determination that a violation of the WPCA can support a claim for nuisance. Of course, before there can be a nuisance under this theory, there must be a finding of a violation of the WPCA, which we have just discussed as it relates to this case. In
 
 Miotke,
 
 the city, in violation of a waste discharge permit, discharged 100 million gallons of raw sewage into a river, which was at a relatively low flow. The sewage went downstream to a lake on which several persons had constructed lake homes. The lake became a putrid mess. It is true — and not surprising — that a claim for nuisance was found to exist on these facts. Even so, the court noted that the litigation was “protracted and complex.” 678 P.2d at 806. How much more difficult would it be to show a violation in the present case?
 

 Furthermore, because of the railyard’s location, there are many other sources of pollution. In order to obtain relief from Union Pacific under a nuisance theory, the state would be required to identify pollution which could be traced to Union Pacific.
 
 See Maas v. Perkins,
 
 42 Wash.2d 38, 253 P.2d 427 (1953);
 
 Smith v. Rodene,
 
 69 Wash.2d 482, 418 P.2d 741 (1966). That is different in kind from a showing that there is hazardous waste on property of which the defendant is the owner.
 

 CMC urges us to superimpose the Model Act on the nuisance statute and find that the nuisance statute provides some of the relief set out in the Model Act. As a practical matter, it does not. For all these reasons, we conclude that the district court correctly determined that Washington statutes existing in 1985 did not form the basis for the filing, by Union Pacific, of a contingent claim in the Milwaukee Road bankruptcy proceeding.
 

 CMC also has appealed the denial of its Rule 60 motion in which it claimed that new evidence required relief from the judgment.
 

 CMC is entitled to relief from the district court’s final judgment only if it can present “newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).” Federal Rule of Civil Procedure 60(b)(2). In order to prevail on its motion, CMC must meet the following prerequisites:
 

 1. The evidence was discovered following trial;
 

 2. Due diligence on the part of the mov-ant to discover the new evidence is shown or may be inferred;
 

 3. The evidence is not merely cumulative or impeaching;
 

 
 *294
 
 4. The evidence is material; and
 

 5. The evidence is such that a new trial would probably produce a new result.
 

 If any of these prerequisites are not met, CMC cannot prevail on its motion.
 

 The denial of a Rule 60(b)(2) motion will not be overturned unless the district court abused its discretion.
 
 McKnight v. United States Steel Corp.,
 
 726 F.2d 333, 336 (7th Cir.1984). To establish an abuse of discretion, CMC must show that no reasonable person could agree with the court; if reasonable persons could disagree as to the propriety of the court’s action there is no abuse of discretion.
 
 Lee v. Village of River Forest,
 
 936 F.2d 976 (7th Cir.1991).
 

 The newly discovered evidence was a November 1994 feasibility study regarding environmental cleanup of the site; a November 1994 letter from the Washington State Department of Ecology to the Port allegedly indicating that the department could direct a cleanup of the site under prior statutes; the sale agreement between Union Pacific and the Port of Tacoma, in which the Port agrees to indemnify Union Pacific from claims under any environmental laws; and an excerpt from an April 1993 hydrogeologic characterization report prepared by a Union Pacific subsidiary.
 

 Conveniently, the newly discovered documents allegedly showed that contrary to the district court’s ruling, affirmative acts on Union Pacific’s part were not required before cleanup liability attached, and even if they were, Union Pacific had engaged in such acts. It was not an abuse of discretion for the court to find that this evidence was not new or, to the extent it was new, that it was not material and would not have changed the underlying decision. We agree with the district court and furthermore find that the newly discovered evidence would not have changed the analysis in our de novo review of the underlying decision.
 

 The decisions of the district court are Affirmed.
 

 [1]
 

 . William H. Rodgers, Jr.,
 
 Environmental Law,
 
 at 685 (2d ed. 1994).
 

 [2]
 

 .
 
 Id.
 

 [3]
 

 .
 
 Superfund II: A New Mandate,
 
 Environment Reporter, Vol. 17, No. 42 (Feb. 13, 1987), at 3.
 

 [4]
 

 . Environment Reporter, at 10.