In re MANVILLE FOREST PRODUCTS
CORPORATION, Reorganized
Debtor.

RIVERWOOD INTERNATIONAL
CORPORATION, Plaintiff,

v.

OLIN CORPORATION, Defendant.

Bankruptcy No. 82 B 11659 (BRL).
Adversary No. 98–8379A.

United States Bankruptcy Court,
S.D. New York.

Oct. 13, 1998.

Lowell Gordon Harriss, Davis, Polk & Wardwell, New York City, for Reorganized Debtor–Plaintiff.

Saul Burian, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for Defendant.

### DECISION GRANTING MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

Riverwood International Corporation ("Riverwood" or "Debtor"), formerly known as Manville Forest Products Corporation ("MFP"), a confirmed chapter 11 debtor, commenced this adversary proceeding against Olin Corporation ("Olin") seeking declaratory relief and damages relating to claims arising from pre-petition indemnification agreements executed in 1967 and 1974 that were allegedly discharged by MFP's confirmation.

*BACKGROUND*

In 1966, Olin incorporated Olinkraft, Inc. ("Olinkraft") as a wholly-owned subsidiary. In 1967, Olin transferred the assets of its forest product division to Olinkraft and in exchange obtained, *inter alia*, an indemnification provision (the "Indemnification Provision") providing that:

> Olinkraft assumes and agrees to pay, perform and discharge, and to save Olin harmless with respect to, and at Olinkraft's expense to defend any actions brought in connection with, all debts, obligations, contracts and liabilities of Olin with respect to such Division of every kind, character and description, whether accrued, absolute, contingent or otherwise. . . .

Among the assets transferred to Olinkraft was certain real property operated by Olin's forest products division, (the "Plant 94 Site") located in Louisiana. In 1974, Olin spun-off Olinkraft into a public company following which both Olin and Olinkraft executed an Indemnification Letter Agreement (the "Indemnification Letter" and together with the Indemnification Provision, the "Indemnity

Agreements"). The Indemnification Letter provided Olinkraft would:

> indemnify and save Olin, its successors and assigns, harmless with respect to, and at Olinkraft's expense to defend any action brought against Olin, its successors and assigns, in connection with (i) all guarantees, indemnities and undertakings by Olin ... (ii) all claims, obligations and liabilities of any kind, including matters now and hereafter in litigation, which may be asserted against or imposed on Olin in respect of Olinkraft....

The Indemnification Letter also provided that "the assumptions by Olinkraft contained in the [Indemnification Provision] from Olin to Olinkraft ... are hereby reaffirmed by Olinkraft."

In 1979, Olinkraft merged into JM Capital, a wholly-owned subsidiary of Johns–Manville Corporation and, subsequently, Olinkraft changed its name to Manville Forest Products. MFP filed a petition for relief under chapter 11 of the United States Bankruptcy Code (the "Code") in 1982. This court set December 29, 1983 (the "Bar Date") as the last date to file pre-petition claims against the Debtor's estate. Notably, Olin was involved in MFP's bankruptcy case filing a notice of appearance and a proof of claim in the amount of $7,500,000 based on its pro rata share of tax liability incurred before the spin-off. The contribution tax claim was settled and paid but at no time did Olin file a proof of claim based on the Indemnity Agreements.

MFP's First Amended and Restated Plan of Reorganization ("Plan") was confirmed by order dated March 26, 1984 ("Confirmation Order"). The Confirmation Order provided that "[t]he Debtor is discharged and released from any and all unsecured debts which arose before the date of confirmation of the Plan, ... and any and all debts of a kind specified [under] §§ 502(g), 502(h), or 502(i) of the Code whether or not ... a proof of claim based on such debt is filed...." *Conf. Order* ¶ 4. The Confirmation Order further mandates that "[a]ll creditors and equity security holders of the Debtor or other entities whose debts are discharged or whose rights and interest are terminated by the Plan and

[the Confirmation Order] are individually and collectively permanently restrained and enjoined from instituting or continuing any action or employing any process to collect such debts or pursue such interests as liabilities or obligations of the Debtor or the Reorganized Debtor or its successors." The Plan provided that "the Debtor shall be deemed discharged from any debt, except as provided in this Plan, which arose before the Confirmation Date and any debt of a kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code whether or not ... a proof of claim based on such debt has been filed." *Plan* III.A. ¶ 1. Following confirmation, MFP changed its name to Riverwood International U.S.A., Inc. and has since changed its name to its present designation.

In 1996, the State of Louisiana Department of Environment Quality ("LDEQ") sent demand notices to Olin and Riverwood for remediation as potentially responsible parties ("PRP") for the Plant 94 Site pursuant to the Louisiana Environmental Quality Act ("LEQA"). As a result, Olin sent a demand letter to Riverwood seeking indemnification arising under the Indemnity Agreements for the Plant 94 Site remediation.

Riverwood now moves for partial summary judgment seeking an order determining that any claim arising under the Indemnity Agreements was discharged by the Confirmation Order. Olin argues in response that, because LEQA was not enacted until four months after confirmation, its demand for indemnification did not constitute a claim within the definition of section 101(5) of the Code and, thus, was not discharged. Additionally, Olin seeks an order declaring that its demand for indemnification was not barred by the Confirmation Order which I treat as a cross-motion for summary judgment.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) ("Federal Rule"), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7056, provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994).

Summary judgment is appropriate if, in light of the evidence presented, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Both parties and the court recognize the appropriateness of summary judgment in this case as neither party alleges any material facts in dispute.[1]

■ Section 1141(d)(1) of the Code provides:

> Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—
>
> (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h) or 502(i) of this title, whether or not—
>
> (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;
>
> (ii) such claim is allowed under section 502 of this title; or
>
> (iii) the holder of such claim has accepted the plan; and

11 U.S.C. § 1141(d)(1) (1994). With certain exceptions not relevant to these facts, confirmation will discharge the debtor from any debt that arose pre-petition. *Id.* Section 101(12) of the Code provides that a "debt" is a "liability on a claim." 11 U.S.C. § 101(12) (1994). This definition reveals that Congress intended that the meanings of "debt" and "claim" be coextensive. *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). *See also* H.R.Rep. No. 95–595, 310 (1977), U.S. Code Cong. & Admin.News 1978 pp.

5963, 6267; S.Rep. No. 95–989, 23 (1978), U.S. Code Cong. & Admin.News 1978 pp. 5787, 5809. As intended by § 1141 of the Code, confirmation will discharge all claims whether such claim was allowed, liquidated, or a proof of claim was filed. *See* 11 U.S.C. § 1141(d)(1) (1994); *Sure–Snap Corp. v. State St. Bank and Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991); *In re U.S.H. Corp. (Grant v. U.S. Home Corp.),* 223 B.R. 654, 657 (Bankr.S.D.N.Y.1998). A claim arising from a pre-petition, non-executory contract is similar to any other pre-petition claim and would be discharged by confirmation. *See Hemingway Transport, Inc. (Woburn Associates v. Kahn),* 954 F.2d 1 (1st Cir.1992); *Denton & Anderson Co. v. Induction Heating Corp.,* 178 F.2d 841 (2d Cir.1949). Thus, generally any claim Olin may assert based on the Indemnity Agreements would be discharged by confirmation. However, Olin does not argue that its Indemnity Agreements claim survives confirmation, instead, it argues that it did not have a claim and, therefore, the Confirmation Order, Plan and section 1141(d) of the Code did not discharge its rights.

■ The central issue in this adversary proceeding is whether the indemnification rights Olin obtained under the Indemnity Agreements constituted a pre-petition claim. Section 101(5)(A) defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, *unmatured,* disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A) (emphasis added). Congress altered the definition of "claim" when it enacted the Code. In explaining the intended definition of "claim" under the Code, the House and Senate Reports provide "[b]y this broadest possible definition [of claim] . . . all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 95–595, at 309 (1977), U.S.Code Cong. & Admin.News 1977, pp. 5963, 6266; S.Rep. No. 95–989, at 21 (1978), U.S.Code Cong & Admin.News 1977, pp. 5787, 5807; *Pennsyl-*

---

1. Riverwood concedes the validity of the Indemnity Agreements for the purposes of this summary judgment motion.

*vania Dep't of Public Welfare,* 495 U.S. at 558, 110 S.Ct. 2126. Although the definition of claim is broad, the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment and, (2) whether that right arose before the filing of the petition. *See In re Chateaugay Corp. (LTV Steel Corp. v. Shalala),* 53 F.3d 478, 496 (2d Cir.1995) ("*Shalala* ") (further stating that "a claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts"). "A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all the elements necessary to give rise to a legal obligation—'a right to payment'—under the relevant non-bankruptcy law." *Id.* at 497 (citing *In re National Gypsum Co.,* 139 B.R. 397, 405 (N.D.Tex.1992)). While the existence of a claim is governed by non-bankruptcy law, the determination of when a claim arises is governed by the Code. *See Shalala,* 53 F.3d at 497 (stating that the language of the Code would determine whether the creditor's right to payment existed at the time of the filing of the debtor's petition); *National Gypsum,* 139 B.R. at 405 ("While non-bankruptcy law governs the existence of a claim under the Code, it is not dispositive of the time at which a claim arises under the Code.").

██ Because contingent and unmatured rights of payment are "claims" under the Code, it is possible that a right to payment that is not yet enforceable at the time of the filing of the petition under non-bankruptcy law, may be defined as a claim within section 101(5)(A) of the Code. A contingent claim within the meaning of section 101(5) is a debt that "does not become an obligation until the occurrence of a future event, but is noncontingent when all of the events giving rise to the liability for the debt occurred prior to the debtor's filing for bankruptcy." *In re Mazzeo (Mazzeo v. United States),* 131 F.3d 295, 303 (2d Cir.1997). Discharge of contingent and unmatured claims has received significant attention; most notably and ironically including Johns–Manville's chapter 11 filing and the significant number of asbestosis claimants whose claims were contingent and undiscoverable at the time of confirmation.

*See In re Johns–Manville Corp.,* 57 B.R. 680 (Bankr.S.D.N.Y.1986). However, there are fundamental differences between types of contingency claims. Namely, depending on whether the claim is based on tort, statute or contract, the results of any determination of when that claim arose may differ significantly. *See In re Chateaugay Corp. (United States v. LTV Corp.),* 944 F.2d 997, 1004–05 (2d Cir.1991) ("*LTV*") (discussing the difference between contingent tort claims and contingent contract claims); *In re Water Valley Finishing, Inc. (Big Yank Corp. v. Liberty Mutual Fire Ins. Co.),* 139 F.3d 325, 328 (2d Cir.1998) (reversing district court's finding that claim for attorneys' fees was discharged because the Second Circuit found that such claim was not based on a contract but imposed by the court).

██ Based on the potential difference in claim accrual date, a determination of the type of potential claim Olin had arising out of the Indemnity Agreements is a threshold issue. Olin bases its right to payment in these proceedings on pre-petition indemnity agreements. The legal relationship which created Olin's alleged present right to indemnity is a pre-petition contract. The derivation of liability and focus of these proceedings is whether any obligation remains on pre-petition indemnity agreements. Therefore, this court will determine whether Olin had a pre-petition claim in terms of whether the Indemnity Agreements created a *contractual claim* that was discharged by confirmation.

In *LTV,* the Second Circuit stated that "[i]n the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship was created.'" *LTV,* 944 F.2d at 1004 (quoting *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.,* 646 F.2d 193 (5th Cir.1981)). *LTV* provides a bright line test for determining whether a contractual contingency claim accrued. Was this a pre-petition obligation of the Debtor that will become due upon the happening of some future event? Was the future event within

the actual or presumed contemplation of the parties at the time the original relationship was created?

The *LTV* test by its terms and other similar scrutiny will generally define obligations arising from pre-petition indemnity agreements as pre-petition claims. *See Houbigant, Inc. (ACB Mercantile, Inc. v. Houbigant, Inc.),* 188 B.R. 347, 358 (Bankr. S.D.N.Y.1995); *In re New York Trap Rock Corp.,* 137 B.R. 568, 573 (Bankr.S.D.N.Y. 1992); *In re Chateaugay Corp.,* 102 B.R. 335, 352 (Bankr.S.D.N.Y.1989) (*"Chateaugay "*). *See also In re Hemingway Transport, Inc. (Woburn Assocs. v. Kahn),* 954 F.2d 1 (1st Cir.1992); *In re THC Fin. Corp.,* 686 F.2d 799 (9th Cir.1982). Indemnity agreements are intended to establish contingent future obligations immediately upon execution. Whether a future event triggers such obligation is a function of the scope of the agreement as governed by the intent of the parties when entering into such agreement.

The Indemnity Agreements undoubtedly created obligations that may become due upon the happening of a future event. Also, it is clear from the breadth of the language in the Indemnity Agreements that indemnification for future environmental cleanup liability was within the actual or presumed contemplation of Olin and Olinkraft at the time the provisions were executed. Further evidence of the intent of the parties is Olin's recent demand letter to Riverwood which states that "[t]he broad, all inclusive language [of the Indemnity Agreements] illustrates the parties intent to resolve all liabilities." (demand letter from Monica Fries to Leonard L. Kilgore, III, Esq. of 6/28/96 at p. 7). As admittedly the parties intent was for Olinkraft to indemnify Olin for all liabilities, the parties must have intended that Olinkraft indemnify Olin for future statutory liability at the time the Indemnity Agreements were executed. In sum, under the *LTV* test or any other similar analysis, the Indemnity Agreements were *contingent contract claims* at the time MFP filed its petition for relief under chapter 11 of the Code.

■ It is of no moment that Olin's specific right to indemnity triggered by LEQA did not mature until after the Bar Date and Confirmation Order. Olin's right to indemnity was contingent at the time the Indemnity Agreements were executed with respect to all liabilities. It is irrelevant whether the event triggering the Debtor's liability under the Indemnity Agreements occurred before or after the petition was filed. *In re Chateaugay Corp.,* 102 B.R. at 352. "Indemnity ... claims which arise as a result of post-confirmation triggering ... events, although presently contingent, cannot escape unaffected by the Debtors' reorganization, and are thus subject to a confirmed plan of reorganization in ... chapter 11 cases." *Chateaugay,* 102 B.R. at 352.

■ Equally inapplicable is the argument that this specific contingency was not within the actual consideration of the claimant at the time of the filing of the petition. The scope of the Indemnity Agreements included "all liabilities." Therefore, Olin's contingent claim included "all liabilities." The scope of the indemnity is a matter to be dealt with in estimation of its claim under 502(c) of the Code and does not relate to whether Olin had a claim within the definition of 101(5)(A) of the Code. "The difficulty or impossibility" of estimating a contingent claim does not constitute a legitimate basis for disallowing any pre-petition right to payment as a claim against the estate. *See Hemingway,* 954 F.2d at 8 (citing *In re Baldwin–United Corp.,* 55 B.R. 885, 898 (Bankr.S.D.Ohio 1985)).

Olin's argument is predicated on cases finding that liability flowing from a statute enacted post-petition is not discharged by confirmation because it was not a claim within the definition of section 101(5)(A) even if based upon pre-petition acts. *See Matter of Chicago, Milwaukee, St. Paul & Pacific RR Co. (CMC Heartland Partners v. Union Pacific RR),* 78 F.3d 285 (7th Cir.1996); *See Shalala,* 53 F.3d at 496–97; *In Matter of Penn Central Transp. Co.,* 944 F.2d 164 (3d Cir.1991); *In re Duplan Corp.,* 209 B.R. 324 (Bankr.S.D.N.Y.1997). However, the distinguishing characteristic in each of these cases is that the claimants' right to payment was based directly on a statute. In our case, Olin's right to payment is grounded in contract—the Indemnity Agreement themselves.

■ *Penn Central, Shalala, LTV* and *Duplan,* which relies on the foregoing cases, state in certain terms that a legal relation-

ship must exist "before one can have an 'interest' which is cognizable as a contingent claim." *Penn Cent.*, 944 F.2d at 167 (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 943 (3d Cir.1985)). *See also Shalala*, 53 F.3d at 497 (quoting the district court and agreeing with the logic of *Penn Central*); *LTV*, 944 F.2d at 1005; *Duplan*, 209 B.R. at 332–333. The legal relationship in each of the *Penn Central, Shalala* and *Duplan* cases was based on a statute enacted after the filing of the petition. The legal relationship in this case was created by contract before the filing of the petition. This distinction is crucial because, in those cases, while the acts giving rise to the liability may have occurred pre-petition, the legal relationship was created post-petition. Without a pre-petition legal relationship, "it would be impossible to find even the remotest right to payment" at the time of the filing of the petition. *Shalala*, 53 F.3d at 497. In this case, the acts and the legal relationship that gave rise to indemnity liability occurred before the filing of the petition and, thus, "the relationship between the Debtor and [Olin] contained all the elements necessary to give rise to a legal obligation—'a right to payment'—under the relevant non-bankruptcy law." *Id.* at 497.

Also, Olin argues that *Chicago, Milwaukee, St. Paul & Pacific RR Co. (CMC Heartland Partners v. Union Pacific RR)*, 78 F.3d 285 (7th Cir.1996) ("*Chicago*") is applicable to these facts. In *Chicago*, a case decided under the Bankruptcy Act of 1898, the Seventh Circuit found that a claim for indemnification under the Washington Model Toxics Control Act was not contingent and, therefore, not a pre-petition claim. *See Chicago*, 78 F.3d at 290. In the first instance, *Chicago* was decided based on the much narrower definition of claim under the Bankruptcy Act of 1898. In the second instance, the indemnity sought in *Chicago* was statutory indemnification under the Washington Model Toxics Control Act and not pursuant to contractual indemnity as the court is faced with here. *Id.* Similar to *Penn Central, Shalala* and *Duplan* the lack of an underlying legal relationship existing at the time of the filing of the petition makes *Chicago* inapplicable to our facts.

This is not a case where a claimant, who was a stranger to the bankruptcy proceedings, discovered recently that he or she may be barred. Olin was an active, sophisticated participant in these bankruptcy proceedings, filing a notice of appearance and proof of claim. Olin was fully aware or is deemed to be aware of the operation of the Plant 94 Site before the spin-off as it was under its direct control as a division or subsidiary. As with any other creditor in the course of MFP's chapter 11 proceedings, Olin was free to file a proof of claim and estimate its indemnity claim under section 502(c) of the Code. Indeed, many environmentally aware creditors strategically eschewed filing contingent claims so as to avoid calling attention to their own potential remedial liabilities.

Both legal and equitable principles require a determination that Olin's indemnity rights constituted a contingent claim discharged by confirmation.

For all of the above reasons, I deny Olin's cross-motion for summary judgment and grant Riverwood's partial summary judgment motion. I have signed an order separately consistent with my findings.